GERALD MULACK, Plaintiff-Appellee, v. HICKORY HILLS POLICE PENSION BOARD, Defendant-Appellant.

First District (6th Division)    No. 1—92—0988

Opinion filed September 3, 1993.

Sklodowski, Franklin, Puchalski & Reimer, of Chicago (Robert L. Sklodowski and Richard J. Puchalski, of counsel), for appellant.

Smolin, Blum & Brandwein, of Chicago (David M. Smolin, of counsel), for appellee.

JUSTICE GIANNIS delivered the opinion of the court:

The Hickory Hills Pension Board (Board or Pension Board) appeals from an order of the circuit court which held that injured police officer Gerald Mulack, plaintiff, was not required to submit to surgery in order to receive a line-of-duty pension under section 3—114.1 of the Pension Code (Ill. Rev. Stat. 1991, ch. 108½, par. 3—114.1). The appellate court has jurisdiction under Illinois Supreme Court Rule 301 (134 Ill. 2d R. 301).

Plaintiff raises two issues for our review: (1) whether the Board erred as a matter of law by holding that the plaintiff must submit to reasonable treatment in order to promote his recovery, as a condition to receiving a duty disability pension; and (2) whether the Board's factual finding that plaintiff had not undergone reasonable treatment was against the manifest weight of the evidence.

On August 31, 1990, plaintiff applied for a line of duty disability pension pursuant to the Pension Code (Ill. Rev. Stat. 1991, ch. 108½, par. 3—114.1). Two hearings were held by the Pension Board concerning plaintiff's disability claim. Evidence at the first hearing, held March 1, 1991, established that the plaintiff had injured himself while engaged in a foot chase of a fleeing suspect on April 10, 1990. Plaintiff's injury was diagnosed as a tear of the posterior medial meniscus of the right knee.

As required by the Pension Code (Ill. Rev. Stat. 1991, ch. 108½, par. 3—115), plaintiff was examined by three physicians selected by the Board. Each doctor concluded that plaintiff was disabled in the line of duty. Dr. John J. Dwyer initially recommended further testing to determine whether a "work hardening program" would be suitable treatment so as to allow plaintiff to return to his duties. Following testing, however, Dr. Dwyer concluded that plaintiff was not fit for work hardening and recommended extensive physical therapy as a prelude to work hardening therapy. Dr. David L. Spencer recommended that plaintiff be placed on disability until his meniscus healed or could be surgically removed. The third doctor, Dr. James W. Ryan, concluded that plaintiff should have surgery to correct his knee and expressed doubt that more conservative treatment would be effective.

Also submitted into evidence were documents from other physicians. Dr. Craig H. Jacobus, a chiropractic physician and plaintiff's treating doctor, indicated that plaintiff was undergoing physical ther-

apy, would not be able to perform regular duty and would have to consider surgery in order to regain normal knee mechanics. Dr. S. I. Yen, a consultant in orthopedic surgery, also concluded that arthroscopic surgery could not be avoided, but that there would be no harm in waiting to see what effect the physical therapy would have. Finally, Dr. Michael J. Liston examined plaintiff and concluded that plaintiff was too sore to return to work. Dr. Liston similarly concluded that "there would be no harm in giving [plaintiff] more time in therapy and see if it will heal on its own."

After all the medical evidence had been submitted, the Pension Board heard from both Dr. Spencer and plaintiff. Dr. Spencer testified first. He testified that plaintiff had a simple torn cartilage and that treatment of the injury would require an arthroscopic surgical procedure. Dr. Spencer stated that if no other significant injury was found, plaintiff could return to work in approximately six weeks. When asked about the risks involved in such treatment, Dr. Spencer described the procedure as a "lead pipe cinch" with a 95%-plus rate of success. According to Dr. Spencer, the procedure could be done on an out-patient basis and could be done with either general anesthesia or through use of a spinal epidural. Dr. Spencer also indicated that plaintiff's injury would grow worse without such treatment.

Plaintiff testified next and recounted how he was injured and the course of his treatment. He testified that he was taking physical therapy twice a week at Dr. Jacobus' office and did work on his own at home, including electronic stimulation. He testified that he had considered surgery to correct his injury, but had concluded that the more conservative measures were the best approach at that time. He testified that this decision was based upon the fact that none of the doctors could give him a 100% chance of full recovery and that he was afraid that additional surgeries would be required. He also expressed fear that he might not wake up after receiving anesthesia. Plaintiff stated that he had experienced slight improvement in his injury after undergoing physical therapy and that he intended to continue treatment in this way, although he was unable to estimate when he would be willing to have surgery should his condition persist.

On May 3, 1991, the Board rendered its decision which stated in part:

> "The evidence here indicates that surgery will eventually be required and the surgery here is safe, efficient and would result in the return of Officer Mulack to police service. The applicant's own physician has indicated that knee surgery is neces-

sary. Failure to have this surgery can further damage Officer Mulack's knee.

Officer Mulack has offered no compelling reason as to why he will not submit to such surgery. There is no evidence that the therapy Officer Mulack is undergoing will correct his knee injury. Indeed, it is the applicant's own treating physician who indicates that orthoscopic surgery cannot be avoided.

In light of the above, it is the Pension Board's decision that Officer Mulack should take steps to have his knee surgically corrected. The Board will grant Officer Mulack a duty disability for ninety (90) days in order for him to have his knee condition remedied. In the event that this condition is not remedied, the Pension Board will take whatever action deemed appropriate at that time."

The Board then awarded plaintiff a line-of-duty disability pension commencing April 1, 1991.

The plaintiff declined surgery following the Board's decision. The 90-day period passed and the Board continued paying duty disability benefits. On September 16, 1991, the Board held a second hearing to afford plaintiff the opportunity to review the status of his knee condition and to determine what steps, if any, had been taken to remedy plaintiff's condition.

Prior to convening this second hearing, the Pension Board had Dr. Spencer reexamine plaintiff. In a letter dated August 23, 1991, Dr. Spencer indicated that plaintiff reported his knee was improving. Dr. Spencer's letter indicated, however, "exaggerated complaints of pain *** that does [*sic*] not correlate with the range of motion of his knee when he is sitting in the examining room, walking and standing normally." Dr. Spencer again recommended surgery. The Board did not send plaintiff to either Drs. Dwyer or Yen for reevaluation.

At the hearing all of the evidence and exhibits from the initial hearing were incorporated as part of the second proceeding. In addition, plaintiff submitted a letter from Dr. Jacobus, who indicated that he was progressing with conservative care and that his prognosis was fair. Plaintiff also submitted a note from Dr. Liston which indicated that plaintiff was still unable to perform his duties as a police officer. Plaintiff testified that he was still undergoing conservative treatment but that he and his physician had not yet elected to remedy his condition through surgery. Plaintiff did indicate that at some future point he would make a decision concerning surgery, but he did not know when that time would be.

On September 23, 1991, the Board terminated plaintiff's disability pension, finding that plaintiff had a correctable physical condition that he unreasonably refused to have remedied. The Board stated in its decision:

> "The issue in this case is whether a pension board must continue to pay disability benefits to a pension beneficiary who unreasonably refuses to have his physical condition safely and efficiently corrected. It is the Board's position that this question must be answered in the negative.
>
> As we pointed out in our initial order, an individual must take such treatment as a reasonably prudent man would take to correct a remediable condition and the inexcusable failure to do so precludes a finding of disability.
>
> The weight of the evidence indicates that arthroscopic surgery is routine, common, safe and very effective way to remedy Officer Mulack's knee problem. This type of surgery is done on an outpatient basis and there is a 95%-plus, success rate. Officer Mulack does not claim that he cannot afford the treatment or that this procedure is against his religious beliefs; Officer Mulack just refuses to have the surgery done."

On October 8, 1991, plaintiff filed a complaint in the circuit court for administrative review (Ill. Rev. Stat. 1991, ch. 110, par. 1—103).

The parties briefed the issues and argued the case on February 20, 1992. On March 12, 1992, the circuit court reversed the Board's decision and reinstated plaintiff's pension benefits. In its decision, the court noted that the Pension Code was unlike the Workers' Compensation Act (Ill. Rev. Stat. 1991, ch. 48, pars. 138.1 through 138.30), which has a specific provision requiring a claimant to submit to reasonable treatment as a condition of receiving benefits. (See Ill. Rev. Stat. 1991, ch. 48, par. 138.19(d).) The court determined that the Pension Code has no similar requirement. Moreover, the court stated that even if the Pension Code were construed as having such requirement, plaintiff's reasonable refusal to submit to arthroscopic surgery should not result in the denial of benefits.

Section 3—114.1 of the Pension Code provides in pertinent part:

> "If a police officer as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service, the police officer shall be entitled to a disability retirement pension of 65% of the salary attached to the rank on the police force held by the

officer at the date of suspension of duty or retirement." (Ill. Rev. Stat. 1991, ch. 108½, par. 3—114.1.) The term "disabled" is not defined.

The primary rule of statutory construction is to ascertain and give effect to the intent of the drafters. (*Thomas v. Greer* (1991), 143 Ill. 2d 271.) Courts first look to the language of the statute itself as the best indication of the intent of the drafters. (*Castillo v. Jackson* (1992), 149 Ill. 2d 165, 175; *County of Du Page v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 151.) Where statutory language is unambiguous, a court must enforce the law as enacted without considering other aids. (*County of Du Page*, 109 Ill. 2d at 151.) Where a statute's language is ambiguous, however, courts give substantial weight and deference to administrative interpretations of the statute, as such agencies are deemed to have significant experience and expertise. (See *Ranquist v. Stackler* (1977), 55 Ill. App. 3d 545, 550.) The deference accorded to agency interpretations of statutes does not displace judicial analysis, however, and an agency's erroneous interpretation of a statute is not binding on the courts. *Castillo*, 149 Ill. 2d at 179.

The parties agree that the proper interpretation to be given the term "disabled" as used in the Pension Code is one of first impression. Plaintiff argues that the term is unambiguous and requires only that he show that his injury renders it impossible for him to properly perform his job. Because all of the evidence produced at both Board hearings established that plaintiff cannot perform his job under his present physical condition, plaintiff argues that there is no dispute that he is disabled under the statute and is entitled to a line-of-duty pension under section 3—114.1. Once it was determined that plaintiff was unable to perform his job, plaintiff argues, the Board erred in failing to cease its inquiry.

Webster's Dictionary defines "disability" as "the inability to pursue an occupation or perform services for wages because of physical or mental impairment." (Webster's Third New International Dictionary 642 (1986).) The term "inability" is defined as a "lack of sufficient power, strength, resources, or capacity." (Webster's Third New International Dictionary 1139 (1986).) The Board argues that the most reasonable interpretation of the statute is to conclude that an officer who is able to correct his disability but unreasonably refuses to do so is not disabled. In addition, the Board cites Illinois authority which indicates that a claimant's injury is not the "result of *** [an] accident *** incurred in or resulting from the performance of an act of duty" (Ill. Rev. Stat. 1991, ch. 108½, par. 3—114.1) after the claimant

refuses routine medical treatment. *Mount Olive Coal Co. v. Industrial Comm'n* (1920), 295 Ill. 429; *Joliet Motor Co. v. Industrial Board* (1917), 280 Ill. 148.

In support of its argument, the Board cites cases decided under provisions of the Workers' Compensation Act. These cases indicate that a claimant must submit to surgery or forego benefits when such surgery is not attended with danger to life or health or extraordinary suffering and when medical opinion indicates that the operation offers a reasonable prospect of relief. (*Mount Olive Coal Co.*, 295 Ill. at 433; *Joliet Motor Co.*, 280 Ill. at 151.) While the Workers' Compensation Act does have, and did have at the time of these decisions, a provision requiring a claimant to submit to "reasonably essential" medical treatment, these decisions do not appear to have relied upon this statutory language in reaching their result. Instead, the supreme court determined that the cause of a claimant's disability does not continue to be an accident after a claimant unreasonably refuses medical treatment.

Specifically, in *Mount Olive Coal Co.* the supreme court stated:

"It is conceded that there is no power in the Industrial Commission or elsewhere to compel defendant in error to submit to an operation, but, on the other hand, it must be conceded that whether the loss of eighty per cent of the use of the right hand of defendant in error is attributable to the accident or to the refusal of defendant in error to have the adhesions in the tendons forcibly broken up is a question for the commission, in the first instance, to determine. The uncontradicted evidence in the record shows that there was no possibility of danger to defendant in error from the operation. It is such an operation as any reasonable man would take advantage of, if he had no one against whom he could claim compensation." (*Mount Olive Coal Co.*, 295 Ill. at 432.)

In *Joliet Motor Co.* the court similarly stated:

"The evidence was that the proposed operation would not be attended with any risk and appears to be such as any reasonable man would take advantage of if he had no one against whom he could claim compensation, and the board found that it was the duty of [claimant] to have the operation performed. Under that finding the refusal of [claimant] was unreasonable, and the continued total loss of sight should be attributed to such refusal and not to the accident." (*Joliet Motor Co.*, 280 Ill. at 151.)

While the present case is not brought under the Workers' Compensation Act, the same rationale should apply under the Pension Code by analogy. As under the Workers' Compensation Act, there is no power in the Board to force plaintiff to undergo surgery under the Pension Code. As under the Workers' Compensation Act, however, the Board is charged with determining whether an officer's disability is "the result of" his or her accident, or is more fairly considered "the result of" a refusal to submit to reasonable medical treatment. See Ill. Rev. Stat. 1991, ch. 108½, par. 3—114.1.

As additional authority, the Board notes that social security claimants who refuse to follow prescribed medical treatments are not considered totally disabled under the Social Security Act. (*Dawkins v. Bowen* (11th Cir. 1988), 848 F.2d 1211, 1213; *Lovelace v. Bowen* (5th Cir. 1987) 813 F.2d 55, 59; *Epps v. Harris* (5th Cir. 1980), 624 F.2d 1267, 1270. See also 20 C.F.R. §416.930(c) (1993) (detailing acceptable reasons for a claimant to refuse treatment under the Social Security Act).) These decisions appear to be grounded upon the Social Security Administration's conclusion that an impairment which is presently capable of being remedied is not "of long continued and indefinite duration." See 42 U.S.C. §416(i)(1)(A) (1988).

Finally, the Board cites decisions from other jurisdictions interpreting disability insurance policies. In *Culver v. Prudential Insurance Co. of America* (1935), 36 Del. 582, 179 A. 400, the court held that a policy requiring an insurance company to pay disability payments when an insured becomes "totally and permanently disabled" did not require the company to pay claims unless the insured "submit[s] to treatment, to which a reasonably prudent man would submit, to lessen the disability, if that is practicable." (*Culver*, 36 Del. at 590, 179 A. at 403.) In *Kordulak v. Prudential Insurance Co.* (1937), 15 N.J. Misc. 242, 190 A. 325, the court stated a similar rule, but found that the evidence presented indicated sufficient risks associated with a hernia operation to not require the insured to undergo treatment. In neither case does it appear that the court grounded its conclusions on specific policy provisions, but merely on its interpretation of the meaning of the word "disability."

We conclude plaintiff's position, that he is under no duty to submit to medical treatment under the terms of the Pension Code, fails for two reasons. First, the Board's decision requiring plaintiff to submit to reasonable treatment is analogous to supreme court precedent construing the Workers' Compensation Act. These decisions indicate that a "disability" is not properly considered "attributable to" or the "result of" an injury after a claimant unreasonably refuses necessary

medical treatment. (*Mount Olive Coal Co.*, 295 Ill. at 432-33; *Joliet Motor Co.*, 280 Ill. at 151.) Second, and as the Board argues, the term "disability" is not inherently unambiguous. We agree with the Board that the term "disability" as used in the Pension Code should be construed to exclude medical conditions which can be remedied without significant danger to life or health or extraordinary suffering and when medical opinion indicates that a prescribed remedy offers a reasonable prospect for relief. This is similar to the approach taken by the Social Security Administration and by the insurance cases cited by the Board.

The question remains, however, whether plaintiff has presented evidence to the Board sufficient for him to meet this standard. We emphasize that requiring plaintiff to submit to medical treatment as a condition of receiving his pension is different from requiring him to submit to the "best" course of treatment as that might be determined by the Board. Medicine is not an exact science, and it is clear that any given ailment may suggest a number of reasonable treatment alternatives depending upon the skills and experiences of the physician making a diagnosis. As the supreme court noted in *Rockford Clutch Division, Borg-Warner Corp. v. Industrial Comm'n* (1966), 34 Ill. 2d 240, 247-48, "[i]f a claimant's response to an offer of treatment is within the bounds of reason, his freedom of choice should be preserved even when an operation might mitigate the employer's damages."

Because we believe the Board failed to properly consider the possibility that a range of medical treatments would have been appropriate for plaintiff's medical condition, we affirm the trial court's determination that plaintiff was, in fact, pursuing a reasonable course of treatment at the time of his hearing. The evidence at both hearings was that plaintiff was taking physical therapy twice a week in his physician's office and every day in his home. No evidence disputed this. Yet in its "conclusions of law," the Board found that petitioner "failed and refused to have his knee condition remedied." The Board relied upon this unsupported conclusion in deciding to deny plaintiff a police pension.

We note that the Board heard evidence from a total of six physicians, yet only Dr. Spencer, Dr. Ryan and Dr. Yen recommended surgery. Of these three, only Dr. Spencer indicated an immediate need for surgery. Of the three other doctors, Dr. Dwyer's report stated that the petitioner needed "more physical therapy to the right knee in an [intensive] program." Dr. Liston indicated that, "we feel that there would be no harm in giving him more time in therapy and see if it

will heal on its own." Similarly, Dr. Jacobus stated that, "[i]t is ***
the thoughts of the specialists and myself that the patient should continue to use the varied therapies to try to make the injury improve non-surgically." In a subsequent report, Dr. Jacobus stated, "[a]t this time patient is PROGRESSING with conservative care. I have had the patient consult with an orthopedic surgical specialist once again who does also recommend continuation of conservative care at this time."

Accordingly, the circuit court's decision is affirmed.

Affirmed.

McNAMARA, P.J., and EGAN, J., concur.