NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190789-U

NO. 4-19-0789

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 4, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| CITY OF CHAMPAIGN, an Illinois Municipal Corporation, | ) ) | Appeal from Circuit Court of |
| Plaintiff-Appellant, | ) | Champaign County |
| v. | ) | No. 18MR903 |
| BOARD OF TRUSTEES of the CITY OF | ) | |
| CHAMPAIGN FIREFIGHTERS' PENSION FUND | ) | Honorable |
| and ZACH WILLIAMS, | ) | Thomas J. Difanis, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the Board of Trustees of the City of
          Champaign Firefighters' Pension Fund did not err in concluding defendant had a
          permanent disability.

¶ 2         In August 2018, defendant, the Board of Trustees of the City of Champaign

Firefighters' Pension Fund (the Board), granted defendant Zach Williams a line of duty disability

pension.  In September 2017, plaintiff, the City of Champaign, an Illinois Municipal Corporation

(the City), filed a complaint for administrative review.  In October 2019, the circuit court

affirmed the Board's decision.

¶ 3         Plaintiff appeals, arguing the Board's determination that Williams had a

permanent disability was against the manifest weight of the evidence.  For the following reasons,

we affirm.

¶ 4                                    I. BACKGROUND

¶ 5          In July 2015, the City hired Williams as a probationary firefighter. In January

2017, Williams was dispatched to a call for a reported heart attack and "later in the dispatch they

said possible DOA." Upon arriving at the scene, Williams spoke with the victim's family, which

allegedly resulted in posttraumatic stress disorder (PTSD). In May 2017, Williams filed an

application for a line-of-duty disability pension based on PTSD resulting from the January

incident. In December 2017, the City filed a petition for leave to intervene in the application for

the line of duty pension for permanent disability. At a hearing held on December 18, 2018, the

Board agreed to allow the petition to intervene.

¶ 6                              A. Evidentiary Hearing

¶ 7          In April 2018, the matter proceeded to an evidentiary hearing where the Board

considered the following evidence.

¶ 8                                    1. *Williams*

¶ 9          Williams testified he had been employed by the Champaign Fire Department for

approximately 2½ years. According to Williams, he sought medical treatment following the

incident. On January 27, 2017, Williams was treated at Carle Hospital Emergency Room for

chest discomfort and heart palpitations. On January 30, 2017, Williams had a follow up

appointment with his primary care physician. On February 13, 2017, Williams began counseling

with Tony Merritt "to assist with symptoms related to severe anxiety/panic attacks including

chest pain/discomfort, difficulty breathing, difficulty being in groups of people, and poor

sleeping." The following day, Williams had another follow up appointment with his primary

care physician, who screened him for depression. The physician assessed Williams with anxiety

and PTSD and prescribed Zoloft and Xanax. In April 2017, Williams had a final appointment

with his primary care physician where he reported minimal response to the medication and "dramatic insomnia." The physician prescribed Seroquel to augment the Zoloft and noted Williams had an upcoming appointment with a psychiatrist.

¶ 10 Williams testified the medication helped him sleep but also had detrimental side effects. Williams stated, "I continued the medication for months and months until my therapy got to a point where I felt like it was okay to wean myself, and that was not directed by anyone but it was okayed by my doctors." According to Williams, he felt as though he could not return to full duty as a firefighter because he was uncertain how he would react. Williams testified he never had anxiety issues before the January 2017 incident.

¶ 11 According to Williams, someone from the peer support group at the Champaign Fire Department referred him to Merritt for counseling. Two psychiatrists and Williams's primary care physician approved of the counseling. Williams testified he would be willing to attend any specific therapy referred by a medical professional. Williams believed he was never referred to any other therapy because the doctors agreed that therapy with Merritt was adequate.

¶ 12 Williams testified he had no religious reservations relative to taking medication. If the consensus of medical professionals was that Williams might be able to return to work if he underwent specific therapy and resumed some medications, Williams was willing to do so. Williams testified he wanted to return to the Champaign Fire Department. Counsel for the City asked Williams if he was willing to attend an additional 12 weeks of treatment, and Williams responded, "I think I've said that I am multiple times." A member of the Board interrupted the questioning to ask Williams if he was all right because he appeared to be struggling. Williams stated he was able to continue with the hearing.

¶ 13        Williams testified he had taken some of the prescribed medicine on three occasions since he weaned himself off the medications.  According to Williams, he took Xanax one evening when something reminded him of the January 2017 incident.  Williams's treating doctors told him therapy with Merritt was appropriate.  Williams never refused to undergo or engage in any treatment recommended by his treating doctors.

¶ 14                                2. *Dr. Terry Killian*

¶ 15        Dr. Terry Killian, the first of three independent medical examiners selected by the Board, examined Williams in September 2017.  Dr. Killian concluded Williams was unable to perform the full duties of a firefighter and the disability was caused by the January 2017 incident.  According to Dr. Killian, Williams's PTSD was severe enough to prevent him from performing the duties of a firefighter because his symptoms were still triggered by various reminders.  Dr. Killian opined it would be "many more months" before Williams could return to work and "his disability would have lasted for more than a year since he first stopped working."  Dr. Killian recommended Williams continue counseling with Merritt and see a psychiatrist for a medication adjustment instead of receiving medications from his primary care doctor.

¶ 16        After reviewing Dr. David Hartman's March 2018 report, Dr. Killian found the recent report did not change any of his previous opinions.

¶ 17                                3. *Dr. Brett Plyler*

¶ 18        On October 3, 2017, Dr. Brett Plyler was the second independent psychiatrist to assess Williams.  Dr. Plyler diagnosed Williams with PTSD as a result of the January 2017 incident.  Dr. Plyler opined Williams met all necessary criteria for the diagnosis, including exposure to a traumatic event, re-experiencing the event, persistent avoidance of stimuli, and increased arousal.  Dr. Plyler concluded Williams still suffered from significant PTSD issues that

would prevent him from resuming his duties as a firefighter. Finally, Dr. Plyler believed Williams's symptoms would continue for at least 12 months. Dr. Plyler recommended Williams continue regular psychotherapy and his psychiatric medications, with a reevaluation in one year to assess if he recovered enough to return to firefighting duties.

¶ 19 Dr. Plyler reviewed Dr. Hartman's March 2018 report and, in an addendum to his original report, wrote as follows:

> "After reading [Dr. Hartman's] report, I do not feel that my
> opinion as to the diagnosis of PTSD for firefighter Zach Williams
> has changed. Though panic disorder and PTSD do have similar
> symptoms, the difference is an initiating event in PTSD. Mr.
> Williams did not have any symptoms of panic prior to the work
> event on January 13, 2017, but he did begin experiencing
> psychological symptoms directly after the event. I cannot attest to
> his current mental health since I did not examine him, but from Dr.
> Hartman's reports, it appears as though Mr. Williams'[s]
> symptoms have improved to a degree. I would recommend 12
> weeks of treatment ***."

¶ 20 At the April 2018 hearing, Dr. Plyler testified that PTSD can be treated through a combination of medication and therapy. According to Dr. Plyler, exposure response therapy taught calming and relaxation techniques to enable an individual to reintegrate into a stressful situation. When asked if someone could eventually wean off the medications, Dr. Plyler testified, "That would be the goal. Work through the therapy, and then the medications keep the symptoms under control as you're doing your therapy and working back in. And then after

- 5 -

you've successfully reintegrated whatever the experience was, then they take you off the medications." Dr. Plyler agreed with Dr. Hartman's recommendation that Williams attend cognitive therapy and take medication. Dr. Plyler testified that, even with his recommended 12 weeks of treatment, it was possible Williams would still be unable to return to work as a firefighter.

¶ 21                                    4. *Dr. Marcia Slomowitz*

¶ 22            On October 10, 2017, Dr. Marcia Slomowitz, the third independent psychiatrist, assessed Williams. Dr. Slomowitz opined Williams was disabled from performing full and unrestricted firefighter duties. According to Dr. Slomowitz, Williams did not suffer from any preexisting condition, his disability was the direct result of the January 2017 incident, and the likely duration of the disability was expected to last more than one year. Dr. Slomowitz diagnosed Williams with panic disorder and major depressive order.

¶ 23            Dr. Slomowitz reviewed Dr. Hartman's March 2018 report. Dr. Slomowitz opined Williams's anxiety symptoms had worsened, likely due to stopping the medication. Dr. Slomowitz stated Williams required cognitive behavior therapy and was "unlikely to reduce his anxiety without either medication or [c]ognitive [b]ehavior [t]herapy." Dr. Slomowitz indicated the eight weeks of therapy Dr. Hartman recommended was appropriate, "but Mr. Williams will most likely need additional sessions when particularly stressful situations at work arise."

¶ 24            At the April 2018 hearing, Dr. Slomowitz testified Williams stated he did not want to return to firefighting. According to Dr. Slomowitz, Williams felt firefighting was too intense and he needed more structure. Although Dr. Slomowitz felt Williams was on the road to recovery, she would not have released him to unrestricted firefighter duties because he needed further treatment. Dr. Slomowitz testified Dr. Hartman's report altered her initial opinions and

conclusions "rather substantially." According to Dr. Slomowitz, Williams stopped taking his medication and changed therapists. Dr. Slomowitz testified she felt the change in treatment "was going in the wrong direction." Dr. Slomowitz agreed Williams would need to be reevaluated before recommending he return to full firefighter duties.

¶ 25                                    5. *Dr. David Hartman*

¶ 26        In March 2018, Dr. David Hartman, a forensic neuropsychologist retained by the city, assessed Williams. According to Dr. Hartman's report, most of Williams's acute symptoms subsided, although he still had thoughts, memories, and worries about his own mortality. Williams reported taking handyman jobs to generate some income, but he did not have a long-term plan. Williams stated he tried not to think about a long-term plan because he did not have an answer. According to the report, Williams stated, "I just really liked what I was doing, and my things were in place. It was a hard job to get, and I like helping people. Now I don't know what to do next." The report indicated Williams attended therapy twice a month with Merritt, who Dr. Hartman described as a Christian counselor. The report stated, "According to Mr. Williams, medications allowed him to sleep better and that they 'changed everything.' Unfortunately, Mr. Williams decided to discontinue medication after six months. 'I had a conflict with Christian issues.' "

¶ 27        Dr. Hartman concluded Williams did "not have a diagnosable psychological syndrome." Dr. Hartman recommended the resumption of medications and therapy that "should more specifically teach behavioral relaxation techniques related to work stress." According to Dr. Hartman, "Mr. Williams should be fully capable for unrestricted work return after 8 weeks of interventions ***. If he refuses, with the rationale that he now understands his job to be

dangerous, this is considered a rational conclusion related to firefighting, and not a psychological disability."

¶ 28    During the April 2018 hearing, Dr. Hartman testified Williams was "mildly anxious, worried, not pathologically so."  Dr. Hartman testified Williams did not have PTSD because he did not have a "personal near[-]death catastrophic threat experience."  Dr. Hartman opined Williams had "a philosophical change of mind" after the January 2017 incident.  Dr. Hartman testified Williams realized that firefighting was not worth the risk inherent in the job and stated, "He saw the relationship of the woman and the child.  I think he saw something of himself in that, and he reweighed it, the things that were important to him, and now I think he is reevaluating whether firefighting is really for him."  Dr. Hartman testified he thought the psychiatrists misdiagnosed Williams.

¶ 29                              B. The Board's Decision

¶ 30    Following the hearing, a Board member made a motion to award a line of duty disability pension retroactive to May 1, 2017.  The Board voted unanimously to grant Williams's claim for line of duty disability pension benefits.  A Board member made a second motion to have Williams submit to his annual examination in November 2018 to see what, if any, recommended treatment he received.  The Board unanimously approved the second motion.  In its written decision, the Board found Williams and the three independent medical examiners credible.  The Board further found Williams "demonstrated by a preponderance of the evidence he is disabled, and his disability resulted from as incurred in the performance of an 'act of duty,' as required under §5/4-110 of the Pension Code."  Finally, the "Board f[ound], as a matter of fact, [Williams's] disability has lasted and/or is expected to last for a continuous period of not less than twelve months."

¶ 31    This appeal followed.

¶ 32    II. ANALYSIS

¶ 33    On appeal, plaintiff argues the Board's determination that Williams had a permanent disability was against the manifest weight of the evidence. Defendants contend the Board's decision was not against the manifest weight of the evidence.

¶ 34    A. Standard of Review

¶ 35    When reviewing an administrative decision, this court is limited to considering the evidence submitted at the administrative hearing and may not consider additional evidence. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 532, 870 N.E.2d 273, 292 (2006). "The applicable standard of review—which determines the extent of deference afforded to the administrative agency's decision—depends upon whether the question presented is a question of fact, a question of law, or a mixed question of law and fact." *Id.* A ruling on a question of fact will be reversed only if it is against the manifest weight of the evidence. *Id.* "In contrast, questions of law are reviewed *de novo* [citation], and a mixed question of law and fact is reviewed under the clearly erroneous standard." *Id.*

¶ 36    "Where, as here, the sole issue is whether a work-related incident is a cause of a claimant's disability, this is a purely factual determination which we review under the manifest weight of the evidence standard." *Carrillo v. Park Ridge Firefighters' Pension Fund*, 2014 IL App (1st) 130656, ¶ 22, 6 N.E.3d 782. Under this standard, the decision of the Board will be reversed only if the opposite conclusion is clearly evident. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504, 877 N.E.2d 1101, 1113 (2007).

¶ 37    B. The Board's Determination of Permanent Disability

¶ 38    "The findings and conclusions of an administrative agency on questions of fact are deemed *prima facie* true and will not be disturbed unless they are against the manifest weight of the evidence." *Miller v. Board of Trustees of Oak Lawn Police Pension Fund*, 2019 IL App (1st) 172967, ¶ 40, 143 N.E.3d 117. It is within the province of an administrative agency to resolve conflicts in the evidence and to determine witnesses' credibility. *Peterson v. Board of Trustees of Firemen's Pension Fund of City of Des Plaines*, 54 Ill. 2d 260, 263, 296 N.E.2d 721, 723 (1973). A reviewing court may not reweigh the evidence or the agency's determination of the credibility of the witnesses. *Haynes v. Police Board of the City of Chicago*, 293 Ill. App. 3d 508, 511-12, 688 N.E.2d 794, 797 (1997).

¶ 39    The City first posits a hypothetical for this court to consider. The City argues a hypothetical firefighter Smith hurts his back and "qualified medical specialists determine that Smith will be able to get back to full duty within the space of 10 months. Assume further that after six months, Smith stops taking his medication and discontinues physical therapy for no valid or even arguably valid medical reason." The City contends this hypothetical is precisely what happened in the present case where Williams ceased taking his medication after six months. The problem with the City's hypothetical is it ignores the findings of all three independent psychiatrists who examined Williams. Dr. Killian's initial report indicated Williams's disability would last for at least 12 months, and his report after reviewing Dr. Hartman's report indicated his opinion remained unchanged. Dr. Plyler's initial report indicated Williams's disability would last for at least 12 months, and his supplemental report after reviewing Dr. Hartman's report indicated his opinion had not changed. Dr. Slomowitz initially opined Williams's disability would last for at least 12 months, and although her opinion was swayed by Dr. Hartman's report, she indicated she expected Williams to require further treatment after Dr. Hartman's

recommended eight-week treatment. Unlike the City's hypothetical (the back injury would be resolved within 10 months), all the medical experts retained by the Board agreed Williams's disability would last for at least 12 months.

¶ 40        The Board argues the evidence supports the Board's finding that Williams suffered a permanent disability. As defined by the Illinois Pension Code, a permanent disability is "any physical or mental disability that (1) can be expected to result in death, (2) has lasted for a continuous period of not less than 12 months, or (3) can be expected to last for a continuous period of not less than 12 months." 40 ILCS 5/4-105b (West 2018). As noted above, all three independent medical examiners opined Williams was disabled as a result of the January 2017 incident and the disability would last for at least 12 months. Clearly, the Board's finding had a basis in the evidence, and it found the psychiatrists to be credible. We note the Board also found Williams to be credible and expressly declined to credit Dr. Hartman's testimony. This court will not reweigh the evidence or the credibility determinations made by the Board. *Haynes*, 293 Ill. App. 3d at 511-12.

¶ 41        Even if Williams's decision to cease taking his medication contributed to his disability, this does not necessarily preclude a finding of a permanent disability. "A claimant need not prove that a duty-related accident is the sole cause, or even the primary cause, of his disability." *Luchesi v. Retirement Board of Firemen's Annuity and Benefit Fund of Chicago*, 333 Ill. App. 3d 543, 550, 776 N.E.2d 703, 709 (2002). Williams only needed to show the duty-related incident was "a causative factor contributing to the claimant's disability." *Id.* Here, all three independent medical examiners concluded Williams's disability was a direct result of the duty-related incident that occurred in January 2017. Williams had no prior history of panic

attacks or mental-health issues. Dr. Plyler and Dr. Killian both independently concluded Williams suffered from PTSD as a result of the January 2017 incident.

¶ 42 Moreover, we disagree with the City's argument that the Board's implicit finding that Williams made a reasonable decision to cease taking his medication was against the manifest weight of the evidence. Williams testified he slowly weaned himself from medication under the supervision of his treating doctors. Nothing in the record rebuts this testimony. Dr. Hartman— who the Board declined to credit—opined Williams required additional therapy and medications. However, Dr. Hartman was not a medical doctor. Although Dr. Plyler testified the suggestion that Williams try different medication from what he was originally prescribed had merit, it does not follow that Williams's decision to cease taking his original medication was unreasonable.

¶ 43 Moreover, Williams continued seeing the same licensed social worker for therapy every two weeks for the duration of the time between the January 2017 incident and the April 2018 hearing. All three independent medical examiners found this therapy to be appropriate and Williams demonstrated slow but steady progress in this therapy. While Dr. Slomowitz and Dr. Plyler agreed with Dr. Hartman's recommendation for cognitive behavioral therapy, it does not mean that Williams's continuation in previously approved-of therapy was an unreasonable refusal to seek treatment for his disability. Again, the Board found Williams's testimony to be credible, and we will not revisit that finding. *Haynes*, 293 Ill. App. 3d at 511-12.

¶ 44 The City cites *Mulack v. Hickory Hills Police Pension Board*, 252 Ill. App. 3d 1063, 625 N.E.2d 259 (1993). The City argues the court in *Mulack* concluded "the term 'disability' as used in the Pension Code should be construed to exclude medical conditions which can be remedied without significant danger to life or health or extraordinary suffering and when medical opinion indicates that a prescribed remedy offers a reasonable prospect for relief." *Id.* at

- 12 -

1071. However, we find *Mulack* distinguishable for two reasons. First, the court in *Mulack* considered the definition of "disability" under a different section of the Code, which provided as follows:

> "If a police officer as the result of sickness, accident[,] or injury
>
> incurred in or resulting from the performance of an act of duty, is
>
> found to be physically or mentally disabled for service in the
>
> police department, so as to render necessary his or her suspension
>
> or retirement from the police service, the police officer shall be
>
> entitled to a disability retirement pension of 65% of the salary
>
> attached to the rank on the police force held by the officer at the
>
> date of suspension of duty or retirement." Ill. Rev. Stat. 1991,
>
> ch. 108 ½, ¶ 3-114.1.

Not only did *Mulack* involve a different statutory provision, it also involved a legal question it reviewed *de novo*. Here, the City argues only that the Board's finding of a disability was against the manifest weight of the evidence. As discussed above, we have concluded there was evidence in the record to support the Board's finding. *Iwanski v. Streamwood Police Pension Board*, 232 Ill. App. 3d 180, 184, 596 N.E.2d 691, 694 (1992) ("[W]hen analyzing claims arising from an administrative agency's determinations, the agency's findings and conclusions on questions of fact are held to be *prima facie* true and correct [citation], and because the weight of the evidence and the credibility of the witnesses are within the province of the board, there need only be some competent evidence in the record to support its findings.").

- 13 -

¶ 45   We conclude the Board's determination that Williams suffered a permanent disability related to the January 2017 incident was not against the manifest weight of the evidence. We therefore affirm the trial court's judgment reaching the same conclusion.

¶ 46                                    III. CONCLUSION

¶ 47   For the reasons stated, we affirm the trial court's judgment.

¶ 48   Affirmed.