2024 IL App (3d) 230257

Opinion filed October 30, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| AARON J. SHIRLEY, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Du Page County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-23-0257 |
| | ) | Circuit No. 22-MR-499 |
| THE VILLAGE OF CLARENDON HILLS | ) | |
| POLICE PENSION FUND, THE BOARD | ) | The Honorable |
| OF TRUSTEES OF THE VILLAGE OF | ) | Craig R. Belford, |
| CLARENDON HILLS POLICE PENSION | ) | Judge, presiding. |
| FUND, and THE VILLAGE OF | ) | |
| CLARENDON HILLS, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court, with opinion.
Justices Peterson and Davenport concurred in the judgment and opinion.
_____

**OPINION**

¶ 1       On August 16, 2022, plaintiff, Aaron Shirley, filed a complaint in the circuit court of

Du Page County against defendants, Village of Clarendon Hills Police Pension Fund, the Board of

Trustees of the Village of Clarendon Hills Police Pension Fund (Board), and the Village of

Clarendon Hills. In his complaint, plaintiff sought administrative review of the Board's denial of

his claims for line-of-duty and non-duty disability pensions. The circuit court upheld the Board's denials, and for the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3        On March 15, 2019, plaintiff, a police sergeant for the Clarendon Hills Police Department (Department), was injured on duty while assisting paramedics with restraining a minor lying on a cot for emergency medical transport. While restraining the minor, plaintiff felt a "pop" in his right shoulder and later experienced severe pain and decreased strength in his arm due to the injury.

¶ 4        On March 19, plaintiff was evaluated at Concentra Occupational Health and assessed with right shoulder and elbow strains. Plaintiff was prescribed physical therapy, ibuprofen, and hot/cold compresses to treat his injury and was also referred to an orthopedic specialist. Exactly one month later, plaintiff was discharged from physical therapy after completing 12 sessions at ATI Physical Therapy.

¶ 5        On April 23, plaintiff was evaluated by Dr. Giridhar Burra, an orthopedic specialist at Hinsdale Orthopedics. In documentation related to the evaluation, Burra noted that plaintiff had a history of migraines that sometimes produced stroke-like symptoms and, after ordering magnetic resonance imaging (MRI) scans of plaintiff's right shoulder, diagnosed him with a lesion of his labrum, otherwise known as a SLAP tear. Burra explained to plaintiff that there were both conservative and surgical treatment options available, a conservative option being physical therapy. Burra further explained that the prognosis for conservative treatment was "very guarded" and that it would be futile for plaintiff to persist with conservative treatment and surgery might have to be considered if his symptoms persisted following six more weeks of physical therapy. Burra expressed that there was no recognized form of conservative treatment that would heal a torn labrum.

¶ 6    Plaintiff declined surgery and opted for continued physical therapy. After plaintiff finished another 12 weeks of physical therapy, Burra reevaluated him and found that his symptoms did not improve and that further attempts at conservative treatment would be futile.

¶ 7    Noting that plaintiff was "extremely guarded" to surgery, Burra ordered him to undergo a functional capacity evaluation (FCE) to determine his ability at that time to perform his job. After plaintiff completed his FCE, Burra concluded that he was at maximum medical improvement based on his decision not to undergo surgery. Burra explained to plaintiff that he could not guarantee anything, but that the majority of patients with his diagnosis were able to return to full functional activities following surgery.

¶ 8    Sometime following the March 15 incident in which he sustained his injury, plaintiff filed a workers' compensation claim, and he was subsequently evaluated by Dr. Matthew Saltzman, the workers' compensation insurance company's doctor. Saltzman likewise diagnosed plaintiff with a SLAP tear of the right shoulder and opined that surgery "would hopefully resolve most if not all of his shoulder pain" and "would be beneficial, particularly given the fact that [plaintiff had] done physical therapy and he complain[ed] of persistent pain and inability to do his job secondary to that pain." Saltzman further opined that, if plaintiff elected to pursue nonoperative treatment of his injury, then he would not need further physical therapy, but would likely occasionally need anti-inflammatory medication, and, in the event of persistent pain, would likely benefit from glenoid labral debridement and possible labral repair and biceps tenodesis.

¶ 9    For approximately two years following his injury, until April 9, 2021, plaintiff was under a light-duty restriction at work, after which time the Department terminated the light-duty position and he stopped working at the Department. On April 5, 2021, plaintiff applied for a line-of-duty disability pension and, in the alternative, a non-duty disability pension.

3

¶ 10    The Board selected three physicians to independently medically examine plaintiff. The first physician, Dr. Thomas Obermeyer, was a board-certified orthopedic surgeon who specialized in shoulder surgery. After examining plaintiff, Obermeyer certified plaintiff as disabled from full and unrestricted duty and concluded that plaintiff had a SLAP tear that was causally related to his March 15 injury. Obermeyer opined that plaintiff's injury was a "treatable lesion that responds favorably to surgical intervention"; that, absent surgery, "it [was] within a reasonable degree of medical certainty his condition [would] not change and he [had] reached maximum medical improvement"; and that surgery "[had] a very favorable prognosis for symptom improvement and return to full and unrestricted police duties, including heavy lifting." Obermeyer noted that the risks associated with the surgery were "those inherent in any shoulder procedure, including residual pain, need for reoperation, stiffness, [and] infection, among others." Obermeyer also noted that, according to plaintiff, his reasons for declining surgery were that he heard anecdotes from his colleagues regarding their past negative experiences with shoulder surgery and was concerned that the surgery would worsen his neurological condition. Obermeyer explained that he had no way of confirming plaintiff's diagnosis of the neurological condition or of evaluating his migraines because he was not trained in neurology.

¶ 11    The second physician, Dr. Jeffrey Williamson-Link, was board-certified in occupational medicine. Williamson-Link examined plaintiff and certified him as being disabled from full and unrestricted duty but was unable to say with medical certainty whether the surgery would allow plaintiff to recover from his disability and return to duty.

¶ 12    The third physician, Dr. Craig S. Phillips, was a board-certified orthopedic surgeon. After examining plaintiff, Phillips certified him as being disabled from full and unrestricted duty and found that he had a SLAP tear. Phillips also found that plaintiff was experiencing "some subjective

4

limitation of his ability," based on Phillips's observations that there was no decrease in strength in the right shoulder while plaintiff performed a series of functional movements, despite sometimes claiming that he felt pain. Phillips opined that plaintiff's claims of pain constituted "symptom manifestation" because plaintiff complained of pain in his shoulder while performing activities that did not involve the use of his shoulder or labrum. Last, Phillips noted the following:

> "[Plaintiff] could undergo a right shoulder arthroscopy with either labral repair or labral repair and tenodesis. The risks of the surgery are small; however, include a less than 1% risk of infection, 3-5% risk of shoulder stiffness, 5% risk of labral retear. Overall, the results of the proposed surgery are 95% good or excellent. Because the surgery is performed in a minimally invasive fashion, that being arthroscopically, major risks are averted. In an individual who has significant pain and difficulty functioning, as alluded to by [Plaintiff], it seems logical that a small surgery such as the above should be something [Plaintiff] would want to pursue. While his migraine history concerns him, this should not be a contraindication to surgical repair, unless deemed so by an anesthesiologist or neurologist. The fact that he chooses not to pursue with this makes me concerned regarding his desire to return to full duty as a police sergeant."

¶ 13　　　　On March 14, 2022, a hearing was held on plaintiff's pension claims. During the hearing, plaintiff testified that he refused surgery partly because he knew people with the same injury and for whom surgery was not successful and because a physician advised him to try to avoid stressful situations due to a neurological condition that he had. Plaintiff further testified that he also refused the surgery because Burra and Saltzman told him that it was accompanied by the risks of infection, ineffectiveness, and exacerbating his injury.

¶ 14　　　　　On July 11, 2022, the Board issued its "Decision and Order" (decision), in which it found that plaintiff suffered an injury resulting from an act of duty, that the remaining option for plaintiff to regain full function of his right shoulder was to receive the recommended surgery, and that this surgery involved slight risks of complications or failure that were substantially outweighed by an overwhelming probability that the surgery would successfully resolve plaintiff's medical issues related to his right shoulder. The Board further found that plaintiff's neurological condition and anecdotes regarding others who had experienced the same injuries were insufficiently supported by the record and that plaintiff's refusal to undergo surgery was unreasonable. The Board concluded, accordingly, that plaintiff's disability was not properly attributable to, or the result of, an injury, and denied plaintiff both line-of-duty and non-duty disability pensions.

¶ 15　　　　　Plaintiff subsequently filed a complaint in the circuit court seeking administrative review of the decision. The circuit court upheld the decision, and plaintiff appeals.

¶ 16　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 17　　　　　On appeal, plaintiff argues that the Board erred by denying him line-of-duty and non-duty disability pensions. Section 3-148 of the Illinois Pension Code (Code) (40 ILCS 5/3-148 (West 2018)) states that judicial review of pension board decisions is governed by the provisions of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)). In a case arising under the Administrative Review Law, it is the administrative agency's decision that is reviewed and not the circuit court's determination. *Anderson v. Department of Professional Regulation*, 348 Ill. App. 3d 554, 560 (2004). The Administrative Review Law provides that our review only extends to the questions of fact and law that are presented by the administrative record and that, consequently, we cannot consider new or additional evidence outside of that record. 735 ILCS 5/3-110 (West 2018).

¶ 18    "The applicable standard of review, which determines the degree of deference given to the agency's decision, depends upon whether the question presented is one of fact, one of law, or a mixed question of law and fact." *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). Rulings on questions of fact will be reversed only if they are against the manifest weight of the evidence, whereas questions of law are reviewed *de novo* and mixed questions of law and fact are reviewed under the clearly erroneous standard. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 532 (2006) (*per curiam*). Under any standard of review, a plaintiff in an administrative proceeding bears the burden of proof, and relief will be denied if he or she fails to sustain that burden. *Id.* at 532-33.

¶ 19    This appeal raises the issues of whether the evidence of record supports the Board's denial of line-of-duty and non-duty disability pensions, which are questions of fact. See *id.* at 534 ("The instant appeal presents the question of whether the evidence of record supports the Board's denial of plaintiff's application for a disability pension. This is a question of fact."). Thus, we will reverse the Board's denials only if they are against the manifest weight of the evidence.

¶ 20    " 'An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident.' " *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007) (quoting *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992)). "The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of the administrative findings." *Abrahamson*, 153 Ill. 2d at 88. Additionally, "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct" (735 ILCS 5/3-110 (West 2018)), and, in examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of an administrative

7

agency (*Cole v. Retirement Board of the Policemen's Annuity & Benefit Fund of Chicago*, 396 Ill. App. 3d 357, 368 (2009)). So long as the record contains evidence supporting the administrative agency's decision, the decision should be affirmed. *Gatz v. Board of Trustees of the Maywood Police Pension Fund*, 2019 IL App (1st) 190556, ¶ 24.

¶ 21                                   A. Denial of Line-of-Duty Disability Pension

¶ 22        Plaintiff first argues that he was entitled to a line-of-duty disability pension for his March 15 injury. Section 3-114.1(a) of the Code provides, in relevant part, that a police officer shall be entitled to receive a line-of-duty disability pension if he or she is found to be physically or mentally disabled for service in the police department, "as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty." 40 ILCS 5/3-114.1(a) (West 2018). The term "disability," as used in the Code, "exclude[s] medical conditions [that] can be remedied without significant danger to life or health or extraordinary suffering and when medical opinion indicates that a prescribed remedy offers a reasonable prospect for relief." *Mulack v. Hickory Hills Police Pension Board*, 252 Ill. App. 3d 1063, 1071 (1993). Thus, a claimant's freedom of choice should only be preserved if the claimant's refusal of treatment is within the bounds of reason, and a compensable disability will not be found if a claimant unreasonably refuses necessary medical treatment. *Coyne v. Milan Police Pension Board*, 347 Ill. App. 3d 713, 725 (2004).

¶ 23        In its decision, the Board determined that plaintiff did not have a compensable "disability" because he refused the recommended surgery to treat his injury and his refusal was unreasonable, in that one of the physicians who evaluated him opined that the results of the surgery were around 95% successful and multiple physicians opined that surgery was necessary for his condition to further improve and that the risks associated with the surgery were minimal and those inherent in any surgery. Another basis for the Board's determination that plaintiff's refusal was unreasonable

8

was that plaintiff failed to present evidence of his stated reasons for refusing the surgery, which were that he knew of others who had similar injuries and for whom surgery was unsuccessful and that he feared that the surgery would worsen his neurological condition.

¶ 24     As he likewise did before the Board, plaintiff now argues that his refusal of surgery was reasonable because four of the physicians who evaluated him identified risks associated with the surgery. Plaintiff cites to *Mulack*, 252 Ill. App. 3d 1063, to support his present argument.

¶ 25     In *Mulack*, a claimant sought administrative review of a pension board's decision to terminate his line-of-duty disability pension upon finding that he refused to undergo reasonable treatment. *Id.* at 1067. On appeal, the court noted that the evidence before the pension board was that three out of the six evaluating physicians recommended surgery, and that, of those three, only one recommended immediate surgery whereas the remaining two opined either that there was no harm in continued conservative treatment or that the claimant should continue with conservative treatment. *Id.* at 1071-72. The court concluded that, because the evidence showed that there was a range of reasonable treatment options, including conservative treatment, available, and the claimant was engaged in conservative treatment, the pension board incorrectly found that the claimant refused to undergo a reasonable treatment. *Id.*

¶ 26     Here, like in *Mulack*, only some of the physicians who evaluated plaintiff recommended surgery to treat his injury. However, unlike in *Mulack*, where two physicians opined that they either saw no harm in conservative treatment or that conservative treatment was recommended, two of the physicians who evaluated plaintiff, Burra and Obermeyer, opined that conservative treatment was futile and none of the remaining physicians recommended, or opined that they saw no harm in, conservative treatment. Thus, the evidence presented at the hearing in this case did not support a finding that conservative treatment, or any treatment other than surgery, was a reasonable

9

remedy to plaintiff's injury. As it follows, plaintiff's use of the *Mulack* decision hurts, rather than advances, his position.

¶ 27    Next, plaintiff argues that his refusal to undergo surgery was reasonable because the refusal was made in good faith and based on his sincere concerns regarding the risks of the recommended surgery and the impact that it might have on his neurological condition. Plaintiff relies on *Keystone Steel & Wire Co. v. Industrial Comm'n*, 72 Ill. 2d 474 (1978), to support his position. Although, as relied on by plaintiff, the claimant in *Keystone* refused additional surgery for his injury and was found to have sincerely feared the additional surgery, that finding of sincerity followed after it was testified to by a psychiatrist and neurologist during the relevant hearing. *Id.* at 479, 481-82. At the hearing in this case, plaintiff did not offer testimony from a psychiatrist, neurologist, or someone similarly qualified to opine on the sincerity or reasonableness of his concerns regarding the recommended surgery or the fact that his neurological condition actually existed. Consequently, the Board did not err by finding that plaintiff presented insufficient evidence demonstrating that he knew of the experiences of others with the same injury, feared the risks of surgery, or had a neurological condition that might be exacerbated to support a finding of good faith. Additionally, our conclusion stands regardless of the fact that some of the evaluating physicians noted plaintiff's concerns regarding the recommended surgery, because in noting that plaintiff expressed these concerns, the physicians did not opine on plaintiff's sincerity.

¶ 28    Plaintiff also argues that the Board's finding that the surgery had a very high probability of success was speculation and that the associated risks were more than minimal. However, plaintiff's arguments are belied by the record. Burra stated that a majority of patients who underwent the surgery were restored to full functional capacity, and Obermeyer stated that the surgery "[had] a very favorable prognosis for symptom improvement and return to full and

10

unrestricted police duties, including heavy lifting." Phillips stated that "the results of the proposed surgery are 95% good or excellent." None of the remaining physicians contradicted these statements. Thus, it was neither speculation nor against the manifest weight of the evidence for the Board to find that the surgery had a very high probability of success.

¶ 29       As to the risks associated with the surgery, Obermeyer stated that they were "those inherent in any shoulder procedure, including residual pain, need for reoperation, stiffness, [and] infection, among others." Phillips stated that the risks of the surgery were "small" and included "a less than 1% risk of infection, 3-5% risk of shoulder stiffness, [and] 5% risk of labral retear." Again, none of the remaining physicians contradicted these statements, and it was not against the manifest weight of the evidence for the Board to find that the risks associated with the recommended surgery were minimal. Moreover, although plaintiff relatedly argues that his refusal to undergo surgery was reasonable because there were risks associated with the surgery, we are aware of no governing law that requires a treatment option to be completely risk-free in order to be deemed reasonable.

¶ 30       Also on the issue of line-of-duty benefits, plaintiff argues that any inconsistencies that the Board discerned in his testimony regarding the symptoms of his injury were irrelevant to its overall determination of whether he had a disability, especially because he consistently testified regarding the pain from his injury and Phillips reported that he was at least experiencing some difficulty functioning. The test for relevance is whether the evidence tends to prove or disprove a matter in issue. *Relevant Evidence*, Black's Law Dictionary 579 (7th ed. 1999). The Board could have inferred from the fact that plaintiff seemingly failed to testify truthfully regarding his symptoms that he also failed to testify truthfully regarding other matters. Because plaintiff testified to facts bearing upon, for example, the issues of whether he indeed suffered an injury or sincerely feared surgical treatment, his incredibility and inconsistency regarding any portion of his testimony had

11

the ability to affect his credibility as to at least these same issues in controversy. Thus, the perceived inconsistencies in his testimony regarding the symptoms of his injury indicated an actual need for supporting evidence, which he did not provide, and were, in fact, relevant to the determination of whether he had a disability.

¶ 31        Last, plaintiff argues that the Board erred by determining that his refusal to undergo surgery was a superseding cause of his disability. A refusal to undergo recommended treatment rises to the level of a superseding cause sufficient to warrant the denial of a pension if the treatment would have restored the claimant's ability to work as a police officer. See *Luchesi v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago*, 333 Ill. App. 3d 543, 555 (2002). In this case, Burra and Obermeyer both opined that the recommended surgery would likely restore plaintiff to full functional activities, including his ability to perform as a police officer. Although the remaining evaluating physicians did not affirmatively opine the same, they also did not contradict the shared opinion of Burra and Obermeyer. Thus, it was not against the manifest weight of the evidence to find that the recommended surgery would have restored plaintiff's ability to work as a police officer and that his refusal to undergo the surgery constituted a superseding cause of his continued disability. As it follows, nor was it against the manifest weight of the evidence for the Board to deny plaintiff a line-of-duty disability pension.

¶ 32                         B. Denial of Non-Duty Disability Pension

¶ 33        Plaintiff next argues that, in the alternative, he was entitled to a non-duty disability pension. Relevant to his argument, section 3-114.2(a) of the Code provides that a police officer is entitled to receive a pension, if he or she is found to be disabled for service in the police department, due to any cause other than an act of duty. 40 ILCS 5/3-114.2(a) (West 2018).

12

¶ 34        In its Decision, the Board found that plaintiff met his burden of proving that he was injured in the performance of an act of duty. The Board explained that, "[a]s such, no finding was entered regarding [plaintiff's] alternative claim for not-on-duty disability." The Board then concluded that "both disability claims [were] denied, based on [plaintiff's] unreasonable refusal to submit to surgery."

¶ 35        Plaintiff now argues that the Board's denial of the non-duty disability pension was contrary to the plain language of section 3-114.2(a), which he contends authorizes a police officer with any disability arising outside of an act of duty to receive a non-duty disability pension, no matter the cause of the disability. Further, by not disputing that the Board found that he unreasonably refused treatment of his injury, and by arguing that there were no facts that precluded his entitlement to a non-duty disability pension in this case, plaintiff seems to go as far as to more specifically contend that section 3-114.2(a) permits even a disabled police officer who unreasonably refuses treatment for his or her injury to receive a non-duty disability pension. Plaintiff cites to *Stec v. Board of Trustees of the Oak Park Police Pension Fund*, 355 Ill. App. 3d 974 (2005), and *Batka v. Board of Trustees of the Orland Park Police Pension Fund*, 186 Ill. App. 3d 715 (1989), to support his present line of argumentation.

¶ 36        Starting with *Stec*, the most that the court there states that in any way relates to our analysis here is that "the plain language of section 3-114.2 contemplates that the officer's condition will necessitate either his suspension or retirement." *Stec*, 355 Ill. App. 3d at 979. As to the remainder of the decision, it is unclear how it supports plaintiff's position, as the overall facts and issues there are wholly inapposite to those in this case. See generally *Stec*, 355 Ill. App. 3d 974 (analyzing whether the surviving spouse of a deceased police officer entitled to a disability pension during his lifetime was eligible to receive survivor's benefits under section 3-120 of the Code (Ill. Rev.

13

Stat. 1987, ch. 108½, ¶ 3-120)). Because the *Stec* decision only shares in happening to mention section 3-114.2, we find it unhelpful to our present analysis and decline to consider it further.

¶ 37     As to *Batka*, the plaintiff there, a patrol officer, applied for both line-of-duty and non-duty disability benefits, alleging that he was experiencing stress that arose from problems with his work and that this stress prevented him from performing his work-related duties. *Batka*, 186 Ill. App. 3d at 717. Following an administrative hearing, the police pension board denied both claims, and the plaintiff sought judicial review of the denials. *Id.* at 717-19. On appeal, the *Batka* court found that, although the plaintiff had proven that he was disabled from performing his duties as a patrol officer, he was not entitled to line-of-duty disability benefits because he had not proven that his stress was caused by his work-related duties. *Id.* at 723-24. The court did find, however, that the plaintiff was entitled to non-duty disability benefits because he was " 'disabled as a result of [a] cause other than the performance of an act of duty.' " *Id.* at 724 (quoting Ill. Rev. Stat. 1987, ch. 108½, ¶ 3-114.2).

¶ 38     Like the plaintiff in *Batka*, all of plaintiff's evaluating physicians in this case found him to be disabled, which none of the parties now dispute on appeal. Plaintiff seemingly argues that the *Batka* decision instructs that the physicians' findings that he was disabled militated a determination by the Board that he was entitled to non-duty disability benefits. However, we disagree because, in finding that the plaintiff there was disabled due to a cause outside of an act of duty, the *Batka* court was not tasked with considering whether that plaintiff had unreasonably refused treatment for his disabling injury. Nor was the reasonableness of the refusal of treatment at all an issue in that case. See generally *Batka*, 186 Ill. App. 3d 715. Consequently, we do not find this decision helpful to our analysis either.

14

¶ 39    In place of the cases offered by plaintiff, we find more instructive courts' repeated iteration that, regardless of the type of pension that a claimant seeks, a compensable disability will not be found if the claimant unreasonably refuses the necessary medical treatment of the disabling injury. See, *e.g.*, *Turcol v. Pension Board of Trustees of Matteson Police Pension Fund*, 359 Ill. App. 3d 795, 803 (2005) ("Regardless of the type of pension a claimant seeks, a compensable disability will not be found if he unreasonably refuses necessary medical treatment."); *Coyne*, 347 Ill. App. 3d at 725 (same). This aligns with the fact that, as we earlier noted, the term "disability," as used in the Code, has been interpreted to "exclude medical conditions [that] can be remedied without significant danger to life or health or extraordinary suffering and when medical opinion indicates that a prescribed remedy offers a reasonable prospect for relief." See *Mulack*, 252 Ill. App. 3d at 1071. Otherwise stated, "if the refusal of treatment rises to the level of a superseding cause of continuing disability, then the Code permits the denial of benefits." *Luchesi*, 333 Ill. App. 3d at 555.

¶ 40    We earlier found that it was not against the manifest weight of the evidence for the Board to determine that plaintiff's refusal of surgery was a superseding cause of his continued disability and unreasonable. As it follows, we now also find that the Board's denial of a non-duty disability pension was not against the manifest weight of the evidence.

¶ 41                                      III. CONCLUSION

¶ 42    The judgment of the circuit court of Du Page County is affirmed.

¶ 43    Affirmed.

*Shirley v. Village of Clarendon Hills Police Pension Fund*, 2024 IL App (3d) 230257

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 22-MR-499; the Hon. Craig R. Belford, Judge, presiding. |
| **Attorneys for Appellant:** | David Figlioli and Patricia J. Kuzebski, of Anesi Ozmon, Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Brian J. LaBardi and Lukasz M. Kornas, of Reimer Dobrovolny & LaBardi PC, of Hinsdale, for appellees the Village of Clarendon Hills Police Pension Fund and the Board of Trustees of the Village of Clarendon Hills Police Pension Fund. |
| | Thomas M. Melody and Colleen M. Shannon, of Klein, Thorpe & Jenkins, Ltd., of Chicago, for other appellee. |