2026 IL App (2d) 250213-U
No. 2-25-0213
Order filed April 21, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

DION SNYDER, Plaintiff-Appellant,

v.

GURNEE POLICE PENSION BOARD, Defendant-Appellee.

Appeal from the Circuit Court of Lake County.
Honorable Luis A. Berrones, Judge, Presiding.
No. 24-MR-447

JUSTICE BIRKETT delivered the judgment of the court.
Justices Schostok and Mullen concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Pension board's denial of police officer's application for a not-on-duty disability pension was not against the manifest weight of the evidence where two out of the three independent medical examiners opined that the officer was not disabled and those opinions were consistent with the officer's medical history and current activity level.

¶ 2     Plaintiff, Dion Snyder, appeals the decision of defendant, the Gurnee Police Pension Board (Board), denying his application for a "not on duty" disability pension under the Illinois Pension Code (Code) (40 ILCS 5/3-114.2 (West 2022)).  We affirm because adequate evidence supports the Board's determination that plaintiff failed to show that he was eligible for a not-on-duty disability pension.

¶ 3                    I. BACKGROUND

¶ 4              A. Overview of Plaintiff's Injury and Work History

¶ 5     Plaintiff was hired as a police officer with the Village of Gurnee Police Department in May 2004 and worked there until he retired on July 29, 2022. Plaintiff served as a patrol officer, field training officer, and defensive tactics instructor.

¶ 6     In December 2020, plaintiff underwent a prostatectomy after being diagnosed with prostate cancer. Plaintiff was prescribed pelvic therapy as part of his rehabilitation and then returned to full duty in March 2021.

¶ 7     On January 3, 2022, plaintiff was off duty and sledding with his son at a local park when his sled went airborne while going down a hill. Plaintiff landed on his tailbone and felt immediate pain from his tailbone to his head. He had excruciating pain for four to five hours. The next day, he visited his primary care physician, Dr. Edward Badal. Dr. Badal prescribed over-the-counter pain relievers, muscle relaxers, and a steroid pack. The injury caused plaintiff to miss two days of work.

¶ 8     Five days later (which included a weekend), plaintiff returned to full duty and worked in that capacity until February 3, 2022, when he was placed on light duty. Plaintiff then returned to full duty again on March 11, 2022. On April 11, 2022, he was removed from the department's payroll.

¶ 9              B. Plaintiff's Disability Application

¶ 10    On July 7, 2022, plaintiff applied for a not-on-duty disability pension under the Code (*id.*). Under the Code, a police officer is entitled to a not-on-duty disability pension if the officer (1) "becomes disabled as a result of any cause other than the performance of an act of duty" and (2) "is found to be physically or mentally disabled so as to render necessary his or her suspension

or retirement from police service in the police department[.]" *Id.* A not-on-duty pension consists of 50% of the officer's salary attached to the officer's rank on the date of suspension or retirement. *Id.*

¶ 11 On the date plaintiff applied for a not-on-duty disability pension, he held the rank of patrol officer.

¶ 12 C. Evidence Before the Board

¶ 13 On November 15, 2023, the Board held a hearing on plaintiff's disability application. The Board received plaintiff's medical history, reports of independent medical examiners, and testimony from two witnesses.

¶ 14 1. Plaintiff's Medical History

¶ 15 The Board and plaintiff stipulated to plaintiff's medical history as set forth in his disability application. That history was as follows.

¶ 16 After Dr. Badal examined plaintiff on January 4, 2022, plaintiff saw Dr. Badal's nurse on January 21, 2022, for lower back pain. An X-ray was ordered.

¶ 17 On January 27, 2022, Dr. Michael Didinsky, D.O., examined plaintiff and noted a normal physical examination except for some "tenderness to palpation upper mid lumbar spine." (Emphasis omitted.) Dr. Didinsky noted that plaintiff had no scars along the lumbar spine, his posture was good, his weight bearing was equal on both feet, and there was no visible paraspinal muscle spasm. In addition, Dr. Didinsky observed no abnormal kyphosis, lordosis, or scoliosis. Plaintiff's gait was non-antalgic. His toe and heel walking, squatting and rising, and tandem walking were performed without muscular difficulty. On the date of the examination, plaintiff underwent an MRI of his lumbar spine, which revealed an "L2 compression deformity with overall good alignment." Dr. Didinsky found "a little intravertebral body disk herniation" but opined that

the compression fracture "should heal well" with "nonoperative care." Dr. Didinsky was not sure why the MRI report reflected a "43% height loss," because "overall the alignment [was] relatively well maintained." Dr. Didinsky placed plaintiff on light duty as of February 3, 2022.

¶ 18   On February 10, 2022, neurosurgeon Dr. Jonathan Citow, M.D., examined plaintiff. Dr. Citow noted that the MRI of plaintiff's L2 compression fracture showed "no pressure on the neural elements." Dr. Citow opined that plaintiff did not need surgery. Dr. Citow noted that plaintiff was alert and in no acute distress. His gait and station were normal, and there was no tenderness upon palpation of the lumbar paraspinal musculature. Also, plaintiff had normal range of motion in his back and all his extremities. Straight-leg raise was negative, and motor strength in all extremities was 5/5. Plaintiff did not feel that he needed physical therapy or anti-inflammatory pain medication. Dr. Citow recommended that plaintiff wear a brace for comfort and noted that he "already ha[d] one." If plaintiff's pain increased, "he would benefit from kyphoplasty, but as long he [was] doing well, this [was] not needed." In Dr. Citow's opinion, plaintiff could return to full duty at the police department (however, plaintiff remained on light duty).

¶ 19   On February 17, 2022, Dr. Didinsky's nurse examined plaintiff. Though plaintiff reported improvement of his symptoms, he still had achiness in his lower back. Dr. Didinsky's nurse advised that plaintiff remain on light duty. On March 10, 2022, plaintiff had a telehealth visit with Dr. Didinsky's nurse and reported that he was "definitely *** improving." Plaintiff was "very eager" to return to work and denied having any new symptoms. Dr. Didinsky's nurse released plaintiff to full duty effective March 11, 2022.

¶ 20   Plaintiff began physical therapy on March 14, 2022. At that time, his intake functional status was "stage 3," meaning he "exhibit[ed] moderate difficulty performing usual work or household activities." On May 17, 2022, his functional status was "stage 4," meaning he

"exhibit[ed] little difficulty performing usual work or household activities and hobbies." However, on June 30, 2022, plaintiff reported difficulties with ordinary activities and was assessed again at stage 3, meaning he "exhibit[ed] moderate difficulty performing usual work or household activities." Overall, plaintiff attended 27 physical therapy sessions, and his rehabilitation potential was noted as "good."

¶ 21    At a March 31, 2022, telehealth visit with Dr. Didinsky's nurse, plaintiff reported that he had returned to full duty but would occasionally "get sharp shooting pain which remind[ed] him of when he initially got injured." He reported having "good days and bad days." Dr. Didinsky examined plaintiff on April 1, 2022, and believed that plaintiff's fracture was "probably mostly healed." Plaintiff was "90% improved." He "still ha[d] some occasional discomfort in his back, which is common." Plaintiff exhibited minimal pain on flexion or extension and only mild tenderness to palpation. Dr. Didinsky recommended that plaintiff continue physical therapy. A follow-up X-ray revealed a "mild" L2 compression deformity.

¶ 22    On April 1, 2022, Dr. Thomas McGowan, M.D., plaintiff's family practice physician, examined plaintiff for back and pelvic pain and darker urine color. Plaintiff's urinalysis was normal, and he was advised to return if his symptoms did not improve. On April 11, 2022, Dr. McGowan's nurse examined plaintiff and advised "no work due to ongoing back issues." Plaintiff's tentative return-to-work date was May 2, 2022. The May 2, 2022, follow-up examination by Dr. McGowan's nurse indicated that plaintiff's lumbar and lumbosacral spine examinations were normal with "no tenderness or spasms and normal lordosis."

¶ 23    On April 14, 2022, and May 2, 2022, plaintiff reported to Dr. Didinsky's nurse that he had lower back pain and difficulty wearing his duty belt. On May 27, 2022, plaintiff underwent a second lumbar MRI. Dr. Didinsky examined plaintiff on June 2, 2022, and noted that the second

MRI indicated that the edema at L2 had subsided. Plaintiff complained of "persistent pain"; his pain was on extension but not flexion. He had no radiculopathy. Dr. Didinsky recommended bilateral L2-L3 facet injections. If the injections did not provide relief, he would consider "cement augmentation." On June 24, 2022, plaintiff reported that the facet injections did not provide any relief. On June 30, 2022, plaintiff reported again that the injections provided no relief. On that date, Dr. Didinsky wrote: "Overall, [plaintiff] is improved from the initial fracture, however, the pain in his back is still debilitating to the point that he cannot wear a gun belt as a police officer, so he cannot work." Dr. Didinsky discussed various options with plaintiff, including "living with this and hoping it gets better with time." They discussed "the possibility of *** seeing Dr. Vashi for other pain management modalities." If nonsurgical options failed, plaintiff could consider an "L2 kyphoplasty."

¶ 24 On July 1, 2022, plaintiff was examined by Dr. Paul Marsiglia, D.O. Plaintiff reported "ongoing" lower back pain and radiculopathy into his legs, although his musculoskeletal examination was normal except for bilateral positive facet maneuvers. Dr. Marsiglia noted that plaintiff's May 27, 2022, MRI "show[ed] facet arthropathy at L4-5, L5-S1 as well as the L2 superior endpoint Schmorls node and mild marrow edema." Plaintiff's symptoms "correlate[ed]" with those conditions. Dr. Marsiglia "recommd[ed] diagnostic L3, L4, L5 medial branch blocks under fluoroscopy to determine how much of his low back pain [was] related to his facet arthropathy."

¶ 25 The Board also received plaintiff's testimony about his medical history. He confirmed that that he received injections and an "ablation." He had not undergone surgery for his back. Dr. Didinsky recommended that plaintiff see a "pain doctor"; "if after that point [plaintiff] [was] not feeling better, *** the only thing [Dr. Didinsky] [could]·think of to do next [was] to put cement in

the spine to try to help." Since applying for a disability pension on July 7, 2022, the only treatment plaintiff received was chiropractic care (one appointment). At the time of the hearing, he was taking medications only for blood pressure and cholesterol.

¶ 26                                  2. Independent Medical Examinations

¶ 27    Per the Code (see 40 ILCS 5/3-115 (West 2022)), the Board arranged for plaintiff to undergo an independent medical examination (IME) by each of three board-certified orthopedic spine surgeons. Each surgeon would review plaintiff's records and physically examine him to determine whether he was disabled from performing his full duties as a police officer. Two of the three surgeons opined that plaintiff was not disabled, and one opined that plaintiff was disabled.

¶ 28    First, Dr. Carl N. Graf, M.D., examined plaintiff on October 28, 2022. He noted that, according to plaintiff, his job duties consisted of patrolling 8-10 hours per day in a squad car, responding to emergency calls, and teaching defensive tactics for the department. Plaintiff described his job as "heavy and physically demanding." Plaintiff reported that his current pain level "depend[ed] on activity" and ranged "1-8/10."

¶ 29    During the examination, plaintiff's gait was normal and he had no difficulty with toe or heel walking, squatting, or rising from a squat. Examinations of his lumbar and sacral spine were normal, with normal flexion and extension. Dr. Graf found no "paraspinal muscular spasm." Plaintiff reported no pain upon palpation of the thoracic and lumbar spine.

¶ 30    Dr. Graf opined that plaintiff suffered from a lumbar compression fracture at L2. According to Dr. Graf, such fractures typically heal "within a short period of time with no residual pain." Dr. Graf, "[t]o a reasonable degree of medical and surgical certainty, *** [was] unable to objectively substantiate that a minimal L2 compression fracture would be considered a disabling injury" for plaintiff. In answer to an interrogatory asking him to "describe any temporary or

- 7 -

permanent restrictions that prevent[ed] [plaintiff] from returning to his duties as a police officer," Dr. Graf answered, "Not applicable. Minimal compression fractures are frequent and typically do not lead to long lasting disability." Although a kyphoplasty was discussed in plaintiff's treatment records, Dr. Graf saw no need for one. From "the spine standpoint," Dr. Graf was "unable to objectively substantiate why [plaintiff] [could not] return to his full duty level job."

¶ 31    Second, Dr. Christopher Bergin, M.D., examined plaintiff on November 9, 2022. He had a normal gait and no difficulty with toe or heel walking, squatting, or rising from a squat. He had "tenderness to palpation throughout his lumbar spine with some mild paraspinal spasm." He had "more pain with extension." Dr. Bergin opined that plaintiff currently suffered from "chronic, debilitating back pain" related to the January 3, 2022, sledding incident. Though plaintiff had been through "a reasonable course of conservative care," he still suffered from "back pain that limit[ed] his normal activities of daily living as well as his professional duties as a police officer." Dr. Bergin opined that plaintiff's "chronic back pain and pelvic pain [were] aggravated by his professional duties as well as normal activities of daily living." Sitting for long periods and wearing his duty belt and vest were the aspects of plaintiff's professional duties that aggravated his back and pelvic pain. Dr. Bergin added: "Certain sudden movements can cause severe back pain and would not allow [plaintiff] to protect himself or others or to effect an arrest safely. His pain would also potentially not allow him to protect his weapon."

¶ 32    Third, Dr. Vivek Mohan, M.D., examined plaintiff on November 17, 2022. He noted that plaintiff complained of pain in his lower back and pelvic region. During the physical examination, plaintiff was able to bend and touch his toes without difficulty. He could extend his spine without difficulty to about 20 degrees but complained of pain during extension. There was no tenderness upon palpation of the lumbar spine in the midline or paraspinal region. Plaintiff reported difficulty

sitting for extended periods and that the pain in his lower back and pelvis was worse while wearing his duty belt. Nonetheless, Dr. Mohan opined that from an orthopedic perspective of plaintiff's lumbar spine, "there [was] no evidence of a disabling injury." Though plaintiff did suffer a compression fracture due to the sledding incident, this was "not a cause of disability as the fracture ha[d] healed and multiple providers ha[d] recommended return back to work full duty without restrictions." Dr. Mohan opined that there was "no evidence [that] any orthopedic conditions in the lumbar spine [were] the cause for [plaintiff's] disability." Thus, "[t]here [was] no explanation for his inability to return to work full duty."

¶ 33    Dr. Mohan further noted that his position was corroborated by (1) Dr. Citow, who opined that plaintiff could return to full duty as of February 2022; (2) Dr. Didinsky, who also opined that plaintiff could return to full duty; and (3) Dr. Marsiglia, who recommended pain treatment for degenerative facet disease, a condition unrelated to plaintiff's alleged disabling condition. Dr. Mohan noted that plaintiff reported that his current activities "includ[ed] sports and hikes with his children including running on a treadmill, riding bikes, and doing stretches." Dr. Mohan concluded that plaintiff could "return back to work full duty without restrictions."

¶ 34    After the IME reports were submitted, plaintiff was examined by chiropractor Ryan Glynn, D.C., on May 8, 2023. Glynn reviewed approximately 1,088 pages of plaintiff's medical records, including the IME reports by Drs. Graf, Bergin, and Mohan. Glynn had plaintiff undergo a "Functional Capacity Evaluation" (FCE), which Glynn described as a "comprehensive assessment conducted by healthcare professionals *** to evaluate an individual's physical and/or cognitive abilities in relation to their functional capacity for work or daily activities." Glynn also evaluated plaintiff per the "AMA Guide to the Evaluation of Permanent Impairment, 6th Edition" (6th ed. 2007) (AMA 6th), which, according to Glynn, "provides a comprehensive framework and

guidelines for medical examiners to assess and evaluate permanent impairments resulting from injuries, illnesses, or medical conditions." Glynn also had plaintiff complete a questionnaire.

¶ 35 According to Glynn, plaintiff's FCE demonstrated a "high degree of reliability for impairment, sensory deficits, and strength deficits." Also, his questionnaire score "reveal[ed] a moderate-severe disability." These findings were consistent with the "[AMA 6th] total body disability score and autonomic response to physical demands." {C. 1300 V3} According to the AMA 6th, the "Whole Person Impairment Calculation[ ]" for plaintiff's lower back was 14%, and his "[a]ctive movement against gravity only, without resistance," was "3/5." Collectively, "these assessments" indicated a prognosis of "Poor, along with a classification of Moderate-Severe Disability." This classification "entail[ed] restricted functionality in daily activities, occasional limitations in physical exertion and posture endurance, both with or without additional load." Regarding the IME providers, Glynn noted that none of them conducted an FCE, which was "essential" to assess plaintiff's "ability to cope with postural demands, material handling, an active daily lifestyle, functional movements of cardiovascular demand, and static lifting."

¶ 36 All three IME providers were given a copy of Glynn's evaluation report and asked to provide supplemental reports indicating whether his report changed their opinions.

¶ 37 First, in his September 13, 2023, report, Dr. Graf noted that Glynn's evaluation was a combination of an FCE, a record review, and an "AMA Impairment Rating." Dr. Graf noted that, although Glynn used the AMA 6th as a guide to assessing plaintiff's disability, that resource states it is " 'not intended to be used for direct estimates of work participation restrictions' " and that " '[i]mpairment percentage is [*sic*] derived according to [AMA 6th] criteria do not directly measure work participation restrictions.' " Further, Dr. Graf questioned Glynn's "17% permanent

impairment rating regarding to [*sic*] [plaintiff's] low back"[1] and his calculation of "near complete loss of strength (rated as 3/5 which is the inability to move against gravity)." According to Dr. Graf, at the time of his IME evaluation, plaintiff had "full 5/5 strength to his lower extremities and further demonstrated the ability to walk on his tip toes, on his heals [*sic*] as well as squat and raise from a squatted position." Dr. Graf opined that "all [of] these activities would not be possible with 3/5 strength" and that Glynn's rating did "not accurately represent [plaintiff's] true abilities." In sum, Dr. Graf was "not able to consider" Glynn's evaluation "as being a valid FCE" or "a valid representation" of plaintiff's disability. Therefore, Glynn's evaluation did not change the conclusions in Dr. Graf's IME report.

¶ 38    Second, in a brief letter, Dr. Bergin noted that he had read Glynn's evaluation, which Dr. Bergin noted was "in a format similar to a[n] [FCE] that includes an AMA impairment rating." Dr. Bergin commented: "This is first time I have ever seen a chiropractor perform a[n] [FCE] or an AMA impairment rating." Glynn's report did not change Dr. Bergin's opinion about plaintiff's condition.

¶ 39    Third, Dr. Mohan's review of Glynn's report did not change his opinion about plaintiff's condition. Dr. Mohan opined that the sledding incident was not the cause of plaintiff's "current disability." According to Dr. Mohan, the compression fracture was "a temporary, limited disability" that had "resolved." Plaintiff was "sent back to work full duty" by several physicians, including Dr. Graf and plaintiff's treating physician, Dr. Citow. Glynn's report did not give a "clear diagnosis of the cause of [plaintiff's] continued complaints, but only vague generalities." Plaintiff's "pain complaints [did not] correlate to a specific diagnosis or spinal dermatomal

---

[1]As best as we can tell, Glynn assessed plaintiff's lower back impairment at 14 percent.

region." Plaintiff was participating in " 'sports and hikes with his children including running on a treadmill, riding bikes and doing stretches' "

¶ 40                                3. Testimony

¶ 41     Glynn testified that he was a board-certified doctor of chiropractic and a board-certified independent medical examiner. He was not, however, a medical doctor. Glynn confirmed having a doctor-patient relationship with plaintiff and having treated him "a couple times" a "couple years ago" Glynn had performed 12 independent medical examinations but not one of a first responder. He was familiar, however, with the day-to-day duties of a patrol officer. Glynn admitted that he had not reviewed all of plaintiff's diagnostic imagery throughout his course of treatment. In his view, the proper way to perform a neurological examination was through an FCE. Asked how plaintiff's FCE related to his impairment rating under the AMA 6th, Glynn explained:

"The AMA 6th edition is strictly—in the back, you'll see *** it's just a standard algorithm.

I got the book if you would like to see it.

You go to it. Here is what they have. They say if they have this type of loss in a disc height in fracture, you are in this classification. Go to the next thing. Then go to the next thing. Right?

The functional capacity screening in chapter—in chapter 2 and—1 and 2 in the AMA rating states that a thorough examination needs to be done for a complete disability impairment rating.

The [FCE] just allows me to kind of gauge where he is at and with what he is doing.

I do not correlate. I don't put the two together when *** I do my actual Impairment rating on the AMA."

Gynn explained that he used the AMA 6th because "we are allowed to do a full examination." He explained:

"So musculoskeletal examination and any type of past medical, social history that we do, that's all in there.

So my functional neuro examination, I was using the—the [FCE] to corroborate with what he was—with what he was telling me, to validate on whether or not that that [*sic*] percentage is correct or not."

¶ 42 Glynn opined that plaintiff was disabled and "not fit for duty." When asked if he rendered a "specific diagnosis" in his report, Glynn testified that he was "independent" and "not allowed to have a diagnosis in there." As an IME provider, he was "not treating" and should not "render any diagnosis." Glynn further testified that he had not treated plaintiff since his May 8, 2023, evaluation.

¶ 43 Plaintiff testified that before the January 3, 2022, sledding incident, he was a "very active person" and exercised four to six days a week. Plaintiff "did lots and lots of mud runs" between 3 and 12 miles, climbed mountains, provided defensive training at the YMCA, and was "active outside" with his family by hiking and "all the other things." But after the sledding incident, "it's no more. Given up to today's date." But plaintiff testified that he still did "handyman" work or "construction stuff" at his house. He also jogged with his son, rode his recumbent bike, coached his son's football team, and was a stay-at-home dad for his children.

¶ 44                                D. Board's Denial of a Disability Pension

¶ 45 On April 3, 2024, the Board unanimously decided to deny plaintiff a not-on-duty disability pension. The Board determined that plaintiff failed to meet his burden of proving the prerequisites of a not-on-duty disability pension. In particular, the Board found "sufficient evidence and

- 13 -

testimony" to conclude that plaintiff was "not disabled from service as a police officer." In reaching its decision, the Board accorded "considerable weight to Dr. Graf['s] and Dr. Mohan's" IME reports. The Board noted that both Dr. Graf and Dr. Mohan "unequivocally" concluded that plaintiff's condition did not disable him from police service, and they offered "detailed explanations in support of their positions." In addition, the Board accorded weight to plaintiff's "treatment records," which "conform[ed] with and/or bolster[ed]" Dr. Graf's and Dr. Mohan's opinions. Also, plaintiff's treatment providers, Dr. Citow and Dr. Didinsky, both believed that plaintiff was capable of returning to full and unrestricted duty after the sledding incident. In sum, "no less than four providers, both treating physicians and [IMEs], reached the same conclusion" with respect to plaintiff's condition, and the Board found their opinions "persuasive."

¶ 46    Further, the Board did "not accord any weight to Chiropractor Glynn's evaluation and hearing testimony." The Board noted that all three IME providers "called into question" Glynn's evaluation of plaintiff. In particular, Dr. Graf found Glynn's evaluation to be neither a valid FCE nor a valid representation of plaintiff's disability. Dr. Graf took issue with Glynn's "misconstruction" (as the Board termed it) of Dr. Graf's physical examination findings. Likewise, Dr. Mohan found that Glynn's report relied on generalities and lacked a clear diagnosis. Finally, all three IME providers questioned Glynn's reliance on impairment ratings based on the AMA 6th.[2]

¶ 47    Moreover, the Board "disagree[d] with Glynn's assertion that IME providers [were] precluded from rendering diagnoses as they relate to a disability applicant's medical conditions." Glynn's position was "diametrically opposed to the statutory function of medical examinations in

_____

[2]Actually, Dr. Mohan did not appear to directly address Glynn's reliance on the AMA 6th.

disability pension cases" under the Code, and this rendered Glynn's "report and conclusions unreliable."

¶ 48 Last, the Board did not "accord any considerable weight" to Dr. Bergin's opinion, which was primarily based upon plaintiff's "ongoing subjective complaints of pain." The Board found Dr. Bergin's opinion "contradictory to the evidence and testimony," which revealed that plaintiff continued to live "a very active lifestyle." Plaintiff's current condition "d[id] not necessitate any ongoing need for medical treatment or intervention." Rather, plaintiff's "current physical state and activity level" bolstered Dr. Graf's and Dr. Mohan's IME reports and "corroborate[d]" plaintiff's "treating provider opinions as well."

¶ 49 Plaintiff subsequently filed a complaint for administrative review of the Board's decision. On April 20, 2025, the trial court denied plaintiff's complaint for administrative review and affirmed the Board's decision.

¶ 50 Plaintiff's timely notice of appeal followed.

¶ 51                                    II. ANALYSIS

¶ 52 Section 3-114.2 of the Code provides:

"A police officer who becomes disabled as a result of any cause other than the performance of an act of duty, and who is found to be physically or mentally disabled so as to render necessary his or her suspension or retirement from police service in the police department, shall be entitled to a disability pension of 50% of the salary attached to the officer's rank on the police force at the date of suspension of duty or retirement." 40 ILCS 5/3-114.2 (West 2022).

¶ 53  "In administrative cases, we review the decision of the administrative agency, not the determination of the circuit court." *Wade v. City of North Chicago Police Pension Board*, 226 Ill.

2d 485, 504 (2007). " 'The applicable standard of review, which determines the degree of deference given to the agency's decision, depends upon whether the question presented is one of fact, one of law, or a mixed question of law and fact.' " *Shirley v. Village of Clarendon Hills Police Pension Fund*, 2024 IL App (3d) 230257, ¶ 18 (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001)). Rulings on questions of fact will be reversed only if they are against the manifest weight of the evidence; questions of law are reviewed *de novo*; and mixed questions of law and fact are reviewed under the clearly erroneous standard. *Id.* "Under any standard of review, a plaintiff in an administrative proceeding bears the burden of proof, and relief will be denied if he or she fails to sustain that burden." *Id.* (citing *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 532-33 (2006) (*per curiam*)).

¶ 54     Plaintiff's appeal challenges whether the evidence supports the Board's denial of a not-on-duty pension. This issue presents a question of fact. See *id.* ¶ 19 (whether the evidence of record supported the Board's denial of both line-of-duty and not-on-duty disability pensions was a question of fact). Section 3-110 of the Code of Civil Procedure (735 ILCS 5/3-110 (West 2022)) provides that the "findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct." See *Marconi*, 225 Ill. 2d at 534. Here, we will reverse the Board's denial only if it is against the manifest weight of the evidence. "An administrative agency's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." (Internal quotation marks omitted.) *Wade*, 226 Ill. 2d at 504. When examining an administrative agency's factual findings, we do not weigh the evidence or substitute our judgment for that of the administrative agency. *Marconi*, 225 Ill. 2d at 534. It is the agency's prerogative to resolve any conflicts presented by the evidence and to determine the credibility of the witnesses. *Moreland v. Retirement Board of the Policemen's Annuity & Benefit Fund of the*

*City of Chicago*, 2025 IL 131343, ¶ 35.  We affirm "[i]f the record contains evidence to support the agency's decision."  *Marconi*, 225 Ill. 2d at 534; see also *Trettenero v. Police Pension Fund of the City of Aurora*, 268 Ill. App. 3d 58, 63 (1994) (because the weight of the evidence and the credibility of the witnesses are uniquely within the province of the administrative agency, there need only be some competent evidence in the record to support its findings).

¶ 55    On appeal, plaintiff makes three general arguments.  First, plaintiff argues that the Board's decision, and its argument on appeal, "*incorrectly cite*[ ] the medical history and opinions of treating and evaluating physicians" (emphasis added), especially Dr. Citow.  Based on the substance of his argument, what plaintiff means is that he disagrees with *the weight* the Board placed on the respective opinions.  Plaintiff argues that the Board relies "most heavily" on Dr. Citow's opinion—"noting repeatedly" (so plaintiff claims) that Dr. Citow cleared plaintiff to return to full duty without restrictions.  The problem with relying on Dr. Citow's opinion, according to plaintiff, is that Dr. Citow saw plaintiff only once—on February 10, 2022.  And at that time, Dr. Citow did not find plaintiff symptom-free but noted that he was wearing a brace for comfort and recommended kyphoplasty for plaintiff if his pain increased despite nonsurgical remedies.  Plaintiff also argues that the Board did not adequately consider plaintiff's treatment history after the February 10, 2022, appointment.  Plaintiff notes that, although the Board recognized that plaintiff was on light duty from February 3, 2022, to March 11, 2022, the physicians who met with him after Dr. Citow's appointment also discussed his potential need for kyphoplasty, which, plaintiff suggests, indicated that plaintiff "did in fact have worsening pain far past the date he saw" Dr. Citow.  Thus, by relying "so heavily" on Dr. Citow, the Board "largely" ignored subsequent doctor's visits and the fact that plaintiff was removed from unrestricted duty twice after his visit to Dr. Citow.  Further, plaintiff accuses the Board of "conflat[ing] [Dr.] Citow's return to work

- 17 -

opinion with the two IME reports finding him not disabled." This was a mistake, plaintiff submits, because "Citow never opined as to [plaintiff's] ultimate disability; he simply found that approximately five weeks after the initial injury that [plaintiff] could return to work at that time."

¶ 56    Relatedly, plaintiff contends that the Board "abandon[ed]" the opinion of Dr. Didinsky, the first physician to examine plaintiff after the sledding accident and also one of the last to examine him in this case. In plaintiff's view, Dr. Didinsky's "ongoing treatment would indicate that [he] found [plaintiff's] complaints of pain credible, as no doctor would prescribe ongoing treatment including a kyphoplasty to introduce cement into his spine, if it was not medically necessary."

¶ 57    Plaintiff's second main argument is that the IME reports finding him not disabled did not address whether he was able to perform his duties as a police officer. Plaintiff acknowledges that Dr. Graf recounted plaintiff's description of his specific job duties as well as plaintiff's assertion that his job was "heavy and physically demanding." When asked to "describe any temporary or permanent restrictions that prevent[ed] [plaintiff] from returning to his duties as a police officer," Dr. Graf answered, "Not applicable. Minimal compression fractures are frequent and typically do not lead to long lasting disability." Plaintiff criticizes Dr. Graf for making no effort to address the effect of plaintiff's injury upon the performance of his specific job duties. Likewise, plaintiff argues that, although Dr. Mohan noted that plaintiff had difficulty sitting for long periods of time and wearing his duty belt, Dr. Mohan failed to "address the specifics" of plaintiff's job duties. Rather, plaintiff argues that Dr. Mohan "only" opined that plaintiff's fracture had healed and that plaintiff was cleared to return to work by Dr. Citow in February 2022. Conversely, plaintiff points out that Dr. Bergin addressed plaintiff's duties "directly," noting that plaintiff's pain was aggravated by his professional duties, such as sitting for long periods and wearing his duty belt. Dr. Bergin was also concerned that plaintiff's condition would limit his ability to make the sudden

movements needed as an officer. According to plaintiff, Dr. Bergin's answers "most directly and credibly" addressed the concern of whether plaintiff could perform his job duties.

¶ 58    Third and last, plaintiff faults the Board for being "dismissive" of Glynn's report, testimony, and relationship to plaintiff. Plaintiff argues that the Board "summarily dismissed" Glynn's findings, especially the FCE directly addressing plaintiff's capacity to perform his job duties. In doing so, the Board thereby was "arbitrary and capricious" and, thus, abused its discretion.

¶ 59    Our review of the record shows that the Board's decision to deny plaintiff a not-on-duty disability pension was not against the manifest weight of the evidence. As the Board points out, several physicians concluded that plaintiff was not disabled. Specifically, two of the IME providers, both board-certified orthopedic spine surgeons, reviewed plaintiff's medical records and physically examined him before opining that he was not disabled. In particular, Dr. Graf noted that plaintiff's lumbar and sacral spine examination was normal, with normal flexion and extension; plaintiff reported no pain while being examined. Plaintiff's gait was normal and he had no difficulty with toe or heel walking, squatting, or rising from a squat. Similarly, Dr. Mohan found that plaintiff could bend and touch his toes without difficulty and extend his lumbar spine to 20 degrees without difficulty (plaintiff reported pain upon extension). Dr. Mohan concluded that plaintiff's subjective pain complaints did not support a conclusion that plaintiff was disabled, particularly given his reported level of activity. Significantly, Dr. Citow, a board-certified orthopedic surgeon, noted normal lumbar spine findings, consistent with Drs. Graf's and Mohan's reports. All three physicians opined that plaintiff did not require additional treatment or surgery and that plaintiff could return to full, unrestricted duty. In addition, Dr. Didinsky opined that plaintiff was capable of returning to full and unrestricted duty and that plaintiff's injury should

heal with nonoperative care. Thus, the Board observed, "no less than four providers, both treating physicians and [IMEs], reached the same conclusion" with respect to plaintiff's condition.

¶ 60 Although plaintiff faults the Board for not placing more weight on Dr. Didinsky's ongoing treatment, plaintiff's argument is flawed. The stipulated medical history included Dr. Didinsky's records, and we presume that the Board considered all relevant evidence. See *Glaser v. City of Chicago*, 2018 IL App (1st) 171987, ¶ 27. Upon first examining plaintiff, Dr. Didinsky believed that his condition after the sledding incident should heal with nonoperative care. Notably, on January 27, 2022—24 days after the sledding incident—Dr. Didinsky reported a normal examination of plaintiff except for some tenderness on palpation. Then, when examined on February 17, 2022, by Dr. Didinsky's nurse, plaintiff showed improvement of his symptoms but still had some achiness in his lower back. On March 10, 2022, during a telehealth visit with Dr. Didinsky's nurse, plaintiff reported that he was "definitely *** improving," was "very eager" to return to work, and had no new symptoms. As a result, plaintiff was released to full duty on March 11, 2022. On April 1, 2022, Dr. Didinsky's examination showed that plaintiff's fracture was "probably mostly healed," and that he was 90% improved with only minimal pain on flexion or extension. On June 2, 2022, Dr. Didinsky saw improvement in plaintiff's MRI findings; plaintiff complained of pain only on extension and did not report radiculopathy. On June 30, 2022, Dr. Didinsky noted plaintiff's complaints of debilitating pain and discussed options.

¶ 61 Nothing overcomes our presumption that the Board considered Dr. Didinsky's treatment and findings. The Board mentioned Dr. Didinsky, particularly his finding in March 2022 that plaintiff was capable of returning to full duty. Nor are we persuaded that the Board was clearly wrong in relying on that finding despite plaintiff's subsequent complaints of pain to Dr. Didinsky and their discussion of treatment options. Even if—as plaintiff asserts—Dr. Didinsky found

plaintiff's pain complaints credible, the Board was the ultimate arbiter of credibility as it weighed those complaints against, *inter alia*, (1) the findings of Drs. Graf and Mohan that those complaints had no correlation in the condition of plaintiff's lumbar spine and (2) plaintiff's "very active lifestyle" at the time of the hearing. It is the Board's province to weigh the evidence and make credibility determinations (see *Marconi*, 225 Ill. 2d at 534 (when examining an administrative agency's factual findings, we do not reweigh the evidence or substitute our judgment for that of the agency)). For all of these reasons, we will not disturb the Board's assessment of Dr. Didinsky's diagnosis and treatment of plaintiff.

¶ 62    Likewise, there is no merit to plaintiff's argument that Drs. Graf and Mohan did not consider his duties as a police officer. The record shows that all the IME providers considered plaintiff's duties as a police officer, given that the Board (1) gave the IME providers plaintiff's written job description and (2) directed the providers to render an opinion as to whether plaintiff suffered from a disability and, if so, whether that condition precluded him from performing unrestricted police duties. In addition, the Board instructed the IME providers to discuss with plaintiff his job duties and perceived limitations. Though plaintiff argues that Dr. Bergin most directly addressed plaintiff's duties as a police officer, the Board explained why it did not "accord any considerable weight" to Dr. Bergin's opinion. According to the Board, Dr. Bergin's opinion was "primarily based" upon plaintiff's "subjective complaints of pain." Moreover, the Board found that Dr. Bergin's opinion contradicted the evidence and testimony, which revealed that plaintiff continued to lead "a very active lifestyle" and his condition "d[id] not necessitate any ongoing need for medical treatment or intervention." The Board was not clear wrong in concluding that plaintiff's "current physical state and activity level" supported the opinions of Drs. Graf and Mohan over the opinion of Dr. Bergin.

¶ 63    Regarding plaintiff's argument that the Board improperly dismissed Glynn's report, we note that the Board explained why it did not accord Glynn's report any weight.  Specifically, the Board noted that all three IME providers "called into question Glynn's evaluation" of plaintiff. Glynn's report did not cause any of the IME providers to change his opinion.  In particular, Dr. Graf did not find Glynn's evaluation to be a " 'valid FCE' " or a " 'valid representation' " of plaintiff's disability, and he took issue with Glynn's "misconstruction" (as the Board termed it) of Dr. Graf's physical examination findings.  Similarly, Dr. Mohan found that Glynn's report was "devoid" of a "clear diagnosis" and instead contained "vague generalities."  Further, Dr. Graf and even Dr. Bergin questioned Glynn's impairment ratings based on the AMA 6th.  Finally, a critical point for the Board was its disagreement with Glynn's assertion that IME providers were precluded from rendering diagnoses as they related to a disability applicant's medical condition; such a position ran contrary to the Code "as well as common sense."

¶ 64    In sum, we agree with the Board that plaintiff's arguments are misconceived because they "encourage [us] to reweigh the evidence" and to "usurp the Board's statutory function."  The Board cites *Moreland* as an example of how a reviewing court should approach a pension board's findings made in the face of conflicting evidence on whether the pension applicant was disabled.  In *Moreland*, the supreme court affirmed the pension board's denial of a duty disability pension to the plaintiff, a police officer.  *Moreland*, 2025 IL 131343 ¶¶ 3, 52.  An IME provider determined that the plaintiff could return to work without restrictions, while the plaintiff's treating physician and the police department itself concluded that the plaintiff was unable to return to work without restrictions.  *Id.* ¶¶ 13-15.  In affirming, the supreme court explained that, although the evidence contained conflicting medical opinions over whether the plaintiff was disabled, the Board elected to place greater weight on the IME provider's opinion and gave reasons why it believed the IME

provider was more credible than the plaintiff's treating physician. *Id.* ¶ 36. The court noted that its function on administrative review was not to reweigh the evidence or to substitute its judgment for that of the Board. *Id.* Because the Board's conclusions were supported by the IME provider's evaluation, the court could not conclude that the Board's decision was against the manifest weight of the evidence. *Id.*

¶ 65     Here, as in *Moreland*, conflicting opinions were presented as to whether plaintiff is disabled. The Board credited some of those opinions over others and gave its reasons. As in *Moreland*, we cannot reverse here without reweighing the evidence or substituting our judgment for that of the Board.

¶ 66     Finally, the cases relied upon by plaintiff are distinguishable and do not affect our conclusion that the Board's denial of a not-on-duty disability pension was not against the manifest weight of the evidence. For example, plaintiff argues that *Kouzoukas v. Retirement Board of the Policeman's Annuity & Benefit Fund of the City of Chicago*, 234 Ill. 2d 446 (2009), has "remarkably similar facts to those here." However, in *Kouzoukas*, the supreme court held that the pension board's decision that the plaintiff was not disabled was against the manifest weight of the evidence because "every medical professional who examined [the plaintiff] found that she suffered pain as a result of a lower back strain" and that the pain "prevented her from returning to work as a full duty officer." *Id.* at 467. Here, unlike in *Kouzoukas*, the majority of the IME providers and treating physicians found that plaintiff was able to return to full duty.

¶ 67     Similarly, in *Ashmore v. Board of Trustees of the Bloomington Police Pension Fund*, 2018 IL App (4th) 180196, ¶ 46, the pension board relied on the report of one physician, who concluded that the plaintiff was not disabled. Although the physician did not dispute the plaintiff's underlying medical condition, his chronic shooting pain, or his five-pound lifting restriction, the physician

mistakenly believed that the plaintiff's job involved only administrative tasks as opposed to patrol duties. *Id.* ¶¶ 46-47. *Ashmore* is distinguishable in that IME providers Drs. Graf and Mohan were not misinformed as to plaintiff's duties as a police officer when rendering their opinion that he was not disabled.

¶ 68   In addition, although plaintiff cites *Hahn v. Police Pension Fund of the City of Woodstock*, 138 Ill. App. 3d 206, 211 (1985) for the proposition that pension statutes are to be liberally construed in favor of those to be benefitted, the court stated this principle while analyzing the broad issue of whether a voluntary resignation completely severs a police officer's membership in a police department and his right to a pension—not while reviewing whether a pension board's fact-intensive decision to deny a disability pension was against the manifest weight of the evidence. See *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 211 (2006) (reversing the pension board's denial of the plaintiff's disability application where five of the six doctors concluded that the plaintiff was disabled).

¶ 69   Having reviewed the evidence and the Board's decision, we cannot say that its decision denying plaintiff a not-on-duty disability pension was against the manifest weight of the evidence.

¶ 70              III. CONCLUSION

¶ 71   For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 72   Affirmed.